**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DIANNE KNOX; WILLIAM L.
BLAYLOCK; ROBERT A. CONOVER;
EDWARD L. DOBROWOLSKI, JR.;
KARYN GIL; THOMAS JACOB HASS;
PATRICK JOHNSON; JON JUMPER, On
Behalf of Themselves and the
Class They Seek to Represent,
        *Plaintiffs-Appellees,*

v.

CALIFORNIA STATE EMPLOYEES
ASSOCIATION, LOCAL 1000, SERVICE
EMPLOYEES INTERNATIONAL UNION,
AFL-CIO-CLC,
        *Defendant-Appellant,*

and

STEVE WESTLY, Controller, State of
California,
        *Defendant.*

No. 08-16645

D.C. No.
2:05-CV-02198-
MCE-KJM

OPINION

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, District Judge, Presiding

Argued and Submitted
October 9, 2009—San Francisco, California

Filed December 10, 2010

Before: J. Clifford Wallace, David R. Thompson and
Sidney R. Thomas, Circuit Judges.

19875

Opinion by Judge Thomas;
Dissent by Judge Wallace

**COUNSEL**

Jeffrey B. Demain, Altshuler Barzon LLP, San Francisco, California, for the defendant-appellant.

W. James Young, National Right to Work Legal Defense Foundation, Inc., Springfield, Virginia, for the plaintiffs-appellees.

**OPINION**

THOMAS, Circuit Judge:

This appeal presents the question of whether a union is required, pursuant to *Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986), in addition to an annual fee notice to members, to send a second notice when adopting a temporary, mid-term fee increase. Under the circumstances presented by this case, we conclude that a second notice is not required, and we reverse the judgment of the district court.

I

A

Congress has long recognized the "important contribution of the union shop to the system of labor relations." *Locke v. Karass*, ___ U.S. ___, 129 S.Ct. 798, 803 (2009) (quoting *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 222 (1977)). The Supreme Court has underscored this Congressional policy by enforcing the right of a union, as the exclusive collective-

bargaining representative of its employees, to require nonunion employees to pay a fair share of the union's costs. *Ellis v. Bhd. of Ry., Airline and S.S. Clerks, Freight Handlers, Express and Station Employees*, 466 U.S. 435, 448 (1984). However, the Supreme Court has also recognized the First Amendment limitation on collection of fees from dissenting employees for the support of ideological causes not germane to the union's duties as collective-bargaining agent. *Id.* at 447.

In *Hudson*, the Supreme Court established certain procedural safeguards to balance these interests by requiring "an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." *Id.* at 310. Notices issued pursuant to this language have become known as "*Hudson* notice[s]." *Wagner v. Prof'l Eng'rs in Cal. Gov't*, 354 F.3d 1036, 1039 (9th Cir. 2004).

After receiving a *Hudson* notice, "the nonunion employee has the burden of raising an objection, but . . . the union retains the burden of proof" as to the appropriate proportion of fair share fees. *Hudson*, 475 U.S. at 306. It is the policies underlying *Hudson* that inform the determination of whether a *Hudson* notice is adequate: "Basic considerations of fairness, as well as concern for the First Amendment rights at stake, . . . dictate that the potential objectors be given sufficient information to gauge the propriety of the union's fee." *Id.*

B

This appeal involves the adequacy of a *Hudson* notice given by SEIU Local 1000 (the "Union"), the exclusive bargaining agent for California state employees. The Union and the State of California have entered into a series of Memoranda of Understanding controlling the terms and conditions of employment for employees, including a provision requiring

that all State employees in these bargaining units join the Union as formal Union members, or if opting not to join, pay an "agency" or "fair share" fee to the Union for its representational efforts on their behalf. *Id.* (known as an "agency shop agreement"). The agency fee is calculated as a percentage of the Union dues paid by members of the Union.

The Union issues a *Hudson* notice to all nonmembers every June. The constitutionally required notice is meant to provide nonmembers with an adequate explanation of the basis of the agency fee. *Hudson*, 475 U.S. at 310. The notice contains information regarding the Union's expenditures from the most recently audited prior year, broken down by major category of expense and then, within each category, allocated between "chargeable" and "non-chargeable" classifications. "Chargeable" expenses are those that are "germane" to the union's representational functions, and can be charged to all nonmembers of the union. *See Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 519 (1991) (Blackmun, J., plurality opinion). "Nonchargeable" expenses are those unrelated to the union's representational functions, such as partisan political expenditures or purely ideological issues. *Id.* The union may charge nonmembers for non-chargeable expenses, but the nonmember has the option to object, and only be charged a reduced agency fee based upon the percent of the union's total expenditures that can be classified as "chargeable." In addition, the nonmember is not charged for certain union-sponsored benefits, such as a credit union credit card, that are not available to nonmembers.

The financial information in the notice forms the basis for calculating the fee to be paid by nonmembers during the ensuing fee year. The notice also provides that for thirty days after the notice is issued, nonunion employees can object to the collection of the full agency fee, and elect instead to only pay a reduced rate during the upcoming fee year based on the percentage ratio of chargeable expenditures to total expenditures. During that thirty day period, nonmembers can challenge the

Union's calculation of its chargeable and non-chargeable expenses, to be resolved by an impartial decision maker. *Knox v. Westly*, No. 2:05-CV-02198, 2008 WL 850128, at *2 (E.D. Cal. Mar. 28, 2008).

A given agency fee is in effect from July 1 through June 30 of the following year (the "fee year"), at which point the agency fee set forth in the Union's next *Hudson* notice goes into effect. The 2005 *Hudson* notice set the agency fee to be paid by nonunion employees as 99.1% of the Union dues.[1] The reduced agency fee of 56.35% of Union dues would be charged to nonmembers who objected to paying the full agency fee, and who requested a reduction pursuant to the procedures and deadlines outlined in the notice. The notice explicitly stated dues and fees were subject to change without further notice to fee payers.

During the summer of 2005, the legislative bodies within the Union debated and approved a temporary assessment (also referred to as a dues and fees increase) equal to .0025, or .25% of Union members' gross wages. The increase took effect at the end of September 2005 and terminated at the end of December 2006, and was expected to raise $12 million for the Union.

Specifically, on July 30, 2005 the Union's Budget Committee proposed an emergency temporary assessment to create what was termed in the agenda item introducing it as a "Political Fight Back Fund." This agenda item stated the Fund "will be used for a broad range of political expenses" in response to several "anti-union" propositions on the November 2005 special election ballot in California, and that the fund "will not be used for regular costs of the union—such as office rent, staff salaries or routine equipment replacement." *Id.* On August 27, 2005 Union delegates voted to implement the tem-

---

[1]As noted, the gap between 99.1% and 100% represents the value of member restricted benefits.

porary dues increase. On August 31, 2005, the Union sent a letter to all members and agency fee payers stating that they were subject to the new increase, and that the fund would be used "to defeat Propositions 76 and 75," other future attacks on the Union pension plan, and other activities.

The Union material indicated that the fund would be used for political activities. Yet, in response to inquiries, the Union specifically stated it intended to split the increase "between political actions and collective bargaining actions." Further, not all of the political activities fell into the "non-chargeable" category. The assessment itself included no spending limitations, and the money was actually used for a range of activities, both political and not, and both chargeable and not.[2] Pursuant to the increase, the Controller began collecting additional fees from Plaintiffs at the end of September 2005.

Plaintiffs represent two classes of nonunion employees, those who objected to the Union's 2005 *Hudson* notice ("objectors") and those who did not ("nonobjectors") (collec-

---

[2]The district court and dissent both conflate political expenses and non-chargeable expenses when condemning the assessment as "purely political" and a drastic departure from usual Union spending. Yet, this is not supported by the record. The later audit revealed the assessment included both chargeable and non-chargeable expenses, and the chargeable percentage for the 2006 Hudson notice, which included the spending from the assessment, was actually larger than that from the 2005 notice.

In addition, not all political expenses are automatically non-chargeable. Rather, if germane to collective bargaining, they can be chargeable just like any other expense. *See, e.g.*, *Lehnert*, 500 U.S. at 520; *Foster v. Mahdesian*, 268 F.3d 689, 692 n.6 (9th Cir. 2001); *Nat'l Treasury Employees Union v. Chertoff*, 452 F.3d 839, 853, 859-60 (D.C. Cir. 2006) (regulation allowing employer to unilaterally abrogate collective bargaining agreements fundamentally diminishes a union's bargaining position and nullifies the right to collective bargaining). Here, Proposition 76 would have effectively permitted the Governor to abrogate the Union's collective bargaining agreements under certain circumstances, undermining the Union's ability to perform its representation duty of negotiating effective collective bargaining agreements.

tively "Plaintiffs"). *Knox*, 2008 WL 850128, at *2. Plaintiffs initiated this action in November 2005, alleging the assessment violated their First, Fifth, and Fourteenth Amendment rights under 42 U.S.C. § 1983. Plaintiffs filed for summary judgment, and the Union filed a cross-motion for partial summary judgment. The district court granted Plaintiffs' motion in its entirety, and partially granted and partially denied the Union's motion. This timely appeal followed.

We review *de novo* a district court's grant of summary judgment on the sufficiency of the *Hudson* notice. *Cummings v. Connell*, 316 F.3d 886, 890 (9th Cir. 2003). On review, we must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

II

A

**[1]** In reviewing the adequacy of the *Hudson* notice, we employ our usual standard of review, as dictated by *Hudson*. In that case, the Supreme Court articulated the legal standard to be applied in this analysis as a balancing test, stating that "[t]he objective must be to devise a way of preventing compulsory subsidization of ideological activity by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities." *Hudson*, 475 U.S. at 302 (quoting *Abood*, 431 U.S. at 237).

The Plaintiffs argue we should abandon the balancing test established in *Hudson*, in favor of strict scrutiny review. They argue that this case involves compelling their speech on political issues, and that therefore the government-mandated speech cases, and their application of strict scrutiny should

apply, citing *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 795 (1988) and *Rosenberger v. Rector & Visitors*, 515 U.S. 819, 827-29 (1995). We disagree.

**[2]** First, *Hudson* itself articulated the legal standard to be applied, and we are not free to reject the balancing test mandated by the Supreme Court.

Second, we articulated the test in *Grunwald v. San Bernandino City Unified Sch. Dist.*, 994 F.2d 1370 (9th Cir. 1993). We noted in that case that in challenges to the First Amendment procedure used by unions, the union need not employ procedures that "would minimize further the burden on agency fee payers." *Grunwald*, 994 F.2d at 1376 n.7. "The test, after all, is not whether the union and the [employer] have come up with the system that imposes the least burden on agency fee payers, regardless of cost (a test no system could possibly satisfy); rather we inquire whether the system reasonably accommodates the legitimate interests of the union, the [public employer] and nonmember employees." *Id.*

Therefore, we will apply the normal *Hudson* balancing and reasonable accommodation test we have used in the past when deciding challenges to *Hudson* notice procedures.[3] *See, e.g.*, *Wagner*, 354 F.3d at 1039; *Cummings*, 316 F.3d at 890.

---

[3]The dissent takes issue with the characterization of *Hudson* requirements as a balancing test, focusing instead on language requiring unions to minimize impingement on nonmembers' rights and emphasizing the Union has no "right" to agency fees to be balanced by such a test. The dissent insists a balancing test is inappropriate, yet, there is no other way to faithfully characterize the procedure set out in *Hudson*. *Hudson* acknowledges that competing interests are at play, and describes a particular set of constitutionally acceptable procedures for attempting resolve with conflict with fairness to both sides. That is a balancing test.

In addition, we have consistently recognized that unions have a legitimate interest and "settled" ability to charge agency fees. *See, e.g.*, *Cummings*, 316 F.3d at 889. We do not intimate this rises to the level of a constitutional "right," but that does not mean the union does not have any rights at all in such a situation. *Hudson*, 475 U.S. at 302 (affirming union's right to "require nonunion employees, as a condition of employment" to pay fair share fees).

B

**[3]** Applying the balancing test, we conclude that the Union did not violate the *Hudson* requirements. The Supreme Court in *Hudson* recognized the impossibility of determining the chargeability of a union's anticipated expenditures at the outset of the fee year, and specifically approved calculating the present year's objector fee based on the prior year's total expenditures. The Supreme Court explained, "We continue to recognize that there are practical reasons why absolute precision in the calculation of the charge to nonmembers cannot be expected or required. Thus, for instance, the Union cannot be faulted for calculating its fee on the basis of its expenses during the preceding year." *Hudson*, 475 U.S. at 307 n.18 (internal quotation marks and citations omitted). *Hudson* thus struck a balance between the rights and burdens in this context, acknowledging that a union is not constitutionally required to take any and all steps demanded by fee payers to insure that its annual fee notice accurately predicts its actual spending in the upcoming year.

**[4]** Use of the prior year method is a practical necessity because, for large public sector unions, the *Hudson* notice must be based on audited financial statements, with the union's chargeable percentage calculation verified by an independent auditor, and the union must send its fee payers the independent auditor's report with its *Hudson* notice. *Hudson*, 475 U.S. at 307 n.18. The audit requirement renders impossible any method of determining the chargeability of the upcoming fee year's expenditures other than basing it on the prior year's actual expenditures, because one cannot audit anticipated future expenditures. Until the money has been spent, the auditor cannot determine whether the expenditures which the union claims it made for certain expenses were actually made for those expenses. *Prescott v. County of El Dorado*, 177 F.3d 1102, 1107 (9th Cir. 1999), *vac'd & remanded on other grounds*, 528 U.S. 1111, *reinstated in relevant part*, 204 F.3d 984 (9th Cir. 2000).

**[5]** The inevitable effect of the *Hudson* "prior year" method is a lag of at least one year between the time when a union incurs expenditures and when the audited ratio of its chargeable expenditures to total expenditures is applied to calculate the objectors' fee for the next year. Fluctuation is inherent in such a method: in each year, objectors may be "underpaying" or "overpaying" fees when compared to the chargeable percentage of the union's actual expenditures in that year because under *Hudson*'s "prior year" method the fee is based upon the chargeable percentage of the prior year's actual expenses, but the inevitable effect of the *Hudson* method is that these over- and undercharges even out over time. The *Hudson* notice can never be more than a *prediction*, which will inevitably be incorrect as to the union's actual expenditures. The *Hudson* notice is not, and cannot be expected to be, more than that.

C

**[6]** The district court faulted the Union for failing to make an accurate prediction in its June 2005 *Hudson* notice of its actual expenditures in the remainder of that fee year due to the subsequent enactment of the temporary increase. Yet, under the normal *Hudson* procedure, any payments over and above the Union's actual chargeable expenditures in the 2005 fee year would be incorporated into the rate for the next fee year. The Supreme Court has determined that this is sufficiently accurate to comply with the constitutional restrictions. There is no principled distinction to be drawn between the paradigmatic *Hudson* procedure and the one employed here.

Indeed, in the usual *Hudson* notice situation, the actual chargeable percentage of a union's actual spending in any given year, as well as the precise dollar amount of dues and fees, will likely vary from the prior year's figures set forth in the applicable *Hudson* notice. The Plaintiffs allege the Union did not provide a procedure that would avoid the risk that nonmembers' funds from the special assessment would be

used, even temporarily, to finance nonchargeable activities, but merely offered dissenters the possibility of a rebate. Therefore, the Plaintiffs reason, the procedure is unconstitutional. This construction takes the central *Hudson* concepts completely out of context and applies them in a way that would not only invalidate the fee increase, but would invalidate the very procedural system decreed by the Supreme Court in *Hudson*. Plaintiffs appear to argue that because the assessment was to be used for "purely" political reasons, it could not be constitutionally collected from nonmembers in the first place, and that any collection and then later incorporation of the non-chargeable amount into a future agency fee objector rate would be tantamount to an impermissible rebate of the earlier fee. Yet, the Union had *already* reduced the fee for objecting nonmembers, and has demonstrated that the assessment was not purely non-chargeable, nor intended to be so. Further, the record belies the assertion that the charges were used "purely" for non-chargeable expenses.[4]

The section of *Hudson* discussing rebates did not condemn the advance reduction procedure the Union used here, but rather a "pure rebate" system where the union collects a fee that is equal or nearly equal to full dues, and then provides a rebate of the non-chargeable portion to objectors only at the end of the fee year. *See Hudson*, 475 U.S. at 305; *see also Ellis*, 466 U.S. at 443-44. Here the Union charged objectors only 56.35% of the temporary increase, the chargeable per-

---

[4]The district court and dissent argue the 2005 Hudson notice is inadequate partly because the prior year method does not speak to the "political" nature of the assessment or the propriety of the Union's chargeability determinations. Yet, we have held there is a fundamental difference between "chargeability" challenges and "procedural" Hudson notice challenges. *Wagner*, 354 F.3d at 1046-47. Plaintiffs explicitly concede theirs is only a procedural notice challenge, not a challenge to the Union's actual spending of the fees. Since, according to Plaintiffs, chargeability is immaterial to their challenge, their chief argument (and that of the dissent) premised upon the alleged non-chargeability of the increase (its *purely* political nature), must fail.

centage set forth in the June 2005 notice, rather than 100% of the increase followed by a later rebate.

Additionally, the district court's direction that a union must issue a second *Hudson* notice when it intends "to depart drastically from its typical spending regime and to focus on activities that [are] political or ideological in nature," *Knox*, 2008 WL 850128 at *8, is practically unworkable. Union spending may vary substantially from year to year—in one year there may be a new collective bargaining agreement negotiated, resulting in a high chargeable percentage for objectors that is followed by an election year that results in a low chargeable percentage for objectors. In fact, for example, the chargeable percentage for 2006, the year incorporating the fee increase spending, was *higher* than that for the 2005 Hudson notice.

**[7]** *Hudson*'s prior year method assumes and accepts that a union has no "typical spending regime," and that even though spending might vary dramatically, a single annual notice based upon the prior year's audited finances is constitutionally sufficient. Otherwise, a union's *Hudson* notice for an upcoming partisan political election year, following a negotiating year, could not be based upon the union's actual total expenditures in the previous year because the union would intend in the coming fee year to "depart drastically from its previous spending regime and to focus on activities that are political or ideological in nature." Yet, this is the system set out by *Hudson*, and no following case has questioned its continuing vitality. The fact that a projection of expenditures may differ from actual expenditures should surprise no one. The key analytic point for *Hudson* purposes is that proper notice is given and subsequent adjustments made.

The district court's conclusion was also at odds with our precedent. The district court required the Union to come up with a system that imposes the least burden on agency fee payers. However, the legal requirement for unions in this situation is to establish a system that merely "reasonably accom-

modates the legitimate interests of the union, the [public employer] and nonmember employees," as is the Union's obligation under *Grunwald*. 994 F.2d at 1376 n.7; *accord Andrews v. Educ. Ass'n of Cheshire*, 829 F.2d 335, 340 (2d Cir. 1987) ("When the union's plan satisfies the standards established by *Hudson*, the plan should be upheld even if its opponents can put forth some plausible alternative less restrictive of their right not to be coerced to contribute funds to support political activities that they do not wish to support."). The 2005 notice satisfied the standards established by *Hudson*.

The Supreme Court's decision in *Davenport v. Washington Education Ass'n*, 551 U.S. 177 (2007), does not lead us to a contrary conclusion. In *Davenport*, the Supreme Court held the *Hudson* requirements outline a minimum set of procedures by which a public sector union in an agency shop relationship could meet its constitutional requirements, and that state *legislatures* may place limitations on a union's entitlement to fees above those laid out in *Hudson*. *Davenport* arose in the context of the state of Washington enacting legislation requiring unions to give all nonmembers the objector fee rate unless they affirmatively agreed to be charged for non-chargeable activities (in contrast to the California rule where silence equals consent, rather than dissent). *Id.* at 182-83. *Davenport* held that while the "silence equals consent rule" is constitutional, it is *also* constitutional for a state to make a "silence equals dissent" rule. *Id.* at 190-91. Under *Davenport*, it is state legislatures, rather than courts, that have the power to implement higher standards. This holding does not alter our conclusion in this case that the 2005 notice was adequate to cover the subsequent dues increase, as *Davenport* does not speak to such a situation.

## III

**[8]** The Union's notice in this case complied with the *Hudson* procedural requirements. Therefore, we reverse the district court, and remand with instructions to deny the Plaintiffs'

motion for summary judgment. We also reverse the denial of defendant's motion for partial summary judgment regarding the consent of nonobjectors under California law, and remand with instructions to grant the motion. We reverse the award of nominal damages to Plaintiffs.

**REVERSED AND REMANDED.**

WALLACE, Circuit Judge, dissenting:

I dissent from the majority's opinion because it is not faithful to the principles guiding the Court's decision in *Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986). The majority begins from an inaccurate account of the interests at stake, and applies the procedures set forth in *Hudson* without due attention to the distinguishing facts of this case. The result is contrary to well-established First Amendment principles.

## I.

I begin with the legal authorization for the agency shop system because it provides the framework for my evaluation of the issues in this case, and because I am of the view that the majority's opinion presents an incomplete account of the relevant legal principles.

## A.

The National Labor Relations Act allows the states to regulate their labor relationships with public sector employees. *See* 29 U.S.C. § 152(2). Many states, including California, allow public-sector unions and government employers to enter into "agency-shop" arrangements. *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 511 (1991); Cal. Gov't Code § 3502.5(a). Defendant SEIU Local 1000 (Union) is the designated bargaining representative for California state employ-

ees, pursuant to such an agency-shop arrangement. The Union is legally obligated to represent equally all employees in the bargaining unit. *Lucas v. NLRB*, 333 F.3d 927, 931-32 (9th Cir. 2003). The Union levies a fee on every employee whom it represents in collective bargaining, even if the employee refuses to join the Union. *See*, *e.g.*, *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 760-764 (1961). The fees paid by bargaining unit employees who are not members of the Union are commonly known as "agency fees" or "fair share fees." Plaintiffs in this case are eight nonmembers of the Union, representing a class of approximately 28,000 public employees, who are required to pay an agency fee.

Agency-shop arrangements present First Amendment concerns. *See id.* at 749 (union shop presents First Amendment "questions of the utmost gravity"); *Railway Employees' Dep't v. Hanson*, 351 U.S. 225, 236-38 (1956). These concerns are particularly sharp in the public sector: "agency-shop arrangements in the public sector raise First Amendment concerns because they force individuals to contribute money to unions as a condition of government employment." *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 181 (2007). The Court explained in *Davenport* that "[r]egardless of one's views as to the desirability of agency-shop agreements, . . . it is undeniably unusual for a government agency to give a private entity the power, in essence, to tax government employees." *Id*. at 184, *citing Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 255 (1977).

Despite the infringement of First Amendment rights engendered by the agency-shop arrangement, the Supreme Court has deemed such arrangements to be constitutionally permissible in principle. *See Locke v. Karass*, 129 S. Ct. 798, 801 (2009) (holding that "in principle, the government may require this kind of payment [*i.e.* agency fees] without violating the First Amendment"). The Court has determined that agency-shop arrangements are "justified by the government's interest in promoting labor peace and avoiding the 'free-rider'

problem that would otherwise accompany union recognition." *Lehnert*, 500 U.S. at 520-21; *see also Abood*, 431 U.S. at 222.

Importantly, however, a union "[may] not, consistently with the Constitution, collect from dissenting employees any sums for the support of ideological causes not germane to its duties as collective-bargaining agent." *Ellis v. Bhd. of Ry., Airline, & S.S. Clerks*, 466 U.S. 435, 447 (1984). Instead, nonmembers may only be compelled to contribute a fair share of costs germane to collective bargaining. *See Bhd. of Ry. & S.S. Clerks v. Allen*, 373 U.S. 113, 118-20 (1963). As a corollary, nonmembers have a constitutional right to "prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative." *Abood*, 431 U.S. at 234; *see also, e.g., Commc'ns Workers v. Beck*, 487 U.S. 735, 762-63 (1988); *Price v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers*, 927 F.2d 88, 90-91 (2d Cir. 1991). "The amount at stake for each individual dissenter does not diminish this concern. For, whatever the amount, the quality of respondents' interest in not being compelled to subsidize the propagation of political or ideological views that they oppose is clear." *Hudson*, 475 U.S. at 305.

**B.**

In addition, procedural protections are constitutionally required in connection with a union's assessment and collection of an agency fee. In *Hudson*, the Court considered whether a union's procedure for the collection of agency fees adequately protected the distinction between germane collective bargaining costs and nonchargeable political expenditures. The Court explained that procedural protections were constitutionally required in this context for two reasons:

> First, although the government interest in labor peace is strong enough to support an "agency shop"

> notwithstanding its limited infringement on nonunion employees' constitutional rights, the fact that those rights are protected by the First Amendment requires that the procedure be carefully tailored to minimize the infringement. Second, the nonunion employee — the individual whose First Amendment rights are being affected — must have a fair opportunity to identify the impact of the governmental action on his interests and to assert a meritorious First Amendment claim.

*Hudson*, 475 U.S. at 302-03. The Court held that, "[s]ince the agency shop itself is 'a significant impingement on First Amendment rights,' . . . the government and union have a responsibility to provide procedures that *minimize that impingement* and that *facilitate a nonunion employee's ability to protect his rights*." *Id*. at 307 n.20 (emphasis added), *quoting Ellis*, 466 U.S. at 455.

In *Hudson*, the defendant, a teacher's union, had implemented a fair share fee calculated as the proportion of chargeable expenditures in the preceding fiscal year, that is, those expenses related to collective bargaining and contract administration. The union also established a procedure for the consideration of nonmembers' objections. The union failed, however, to provide nonmembers with any explanation of how the fair share fee was calculated or explanation of the union's procedures. The Court held that the union's procedure was inadequate for three reasons: "because it failed to minimize the risk that nonunion employees' contributions might be used for impermissible purposes, because it failed to provide adequate justification for the advance reduction of dues, and because it failed to offer a reasonably prompt decision by an impartial decisionmaker." *Id*. at 309.

First, the procedure at issue in *Hudson* was constitutionally deficient because it merely offered dissenters the possibility of a rebate; it failed to minimize the possibility that dissent-

ers' funds would be used for an improper purpose in the first place. The Court stressed that the union should not be permitted to exact an agency fee from dissenters "without first establishing a procedure which will avoid the risk that their funds will be used, *even temporarily*, to finance ideological activities unrelated to collective bargaining." *Id.* at 305 (emphasis added; internal quotation marks omitted), *citing Abood*, 431 U.S. at 244 (concurring opinion).

Second, the union's procedures were held constitutionally deficient because employees had not been provided with sufficient information about the basis of the proportionate share: "[b]asic considerations of fairness, as well as concern for the First Amendment rights at stake, also dictate that the potential objectors be given sufficient information to gauge the propriety of the union's fee." *Id.* at 306. In *Abood*, the Court had stated that it was a union's duty to provide "the facts and records from which the proportion of political to total union expenditures can reasonably be calculated." 431 U.S. at 239-40, n.40, *quoting Allen*, 373 U.S. at 122. The Court went further in *Hudson*, holding that the union was required to provide this information *without* awaiting an objection. *Hudson*, 475 U.S. at 306.

Third, *Hudson* held that there must be a dispute resolution procedure. The Court stated that a union must provide both "a reasonably prompt *opportunity* to challenge the amount of the fee" as well as "a reasonably prompt *decision by an impartial decisionmaker*." *Id.* at 307, 310 (emphasis added). The procedure at issue in *Hudson* was inadequate because it was controlled by the union and did not provide for an impartial decisionmaker. *Id.* at 308 (describing the " 'most conspicuous feature of the procedure is that from start to finish it is entirely controlled by the union' "). The Court further held that a union must provide an "escrow for the amounts reasonably in dispute while such challenges are pending." *Id.* at 310.

Drawing on these considerations, *Hudson* outlined three requirements for a union's collection of an agency fee: (1) "an

adequate explanation of the basis for the fee," (2) a "reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker," and (3) "an escrow for the amounts reasonably in dispute while such challenges are pending." *Id.* at 310.

## C.

Surprisingly, in the case before us the majority characterizes the *Hudson* "test" as a "balancing test" or "reasonable accommodation test." The majority chooses, moreover, to highlight the Union's interests, stating that Congress has recognized the "important contribution of the union shop to the system of labor relations," and that "[t]he Supreme Court has underscored this Congressional policy by enforcing the *right* of a union, as the exclusive collective-bargaining representative of its employees, to require nonunion employees to pay a fair share of the union's costs."

The majority puts its finger on the wrong side of the scale. A union has no "right" to the collection of agency fees, and *Hudson* does not call for merely a "reasonable accommodation" of employees' constitutional rights. From the framework described above, I view the Union's procedures much differently than the majority. I fear that the majority's account of the interests at stake, compounded by its view of the operative legal test, invites confusion. Indeed, it tampers with vitally important First Amendment principles.

## 1.

I cannot begin from the proposition that we are required to balance the "rights" of the Union against the rights of the employees it represents. While the majority insists that the only way "to faithfully characterize the procedures set out in *Hudson*" is to "balance" the Union's "right" to collect agency fees against the first amendment rights of non-union employees [Maj. Op. 19884 n. 3], it is the majority that is unfaithful

to *Hudson* and her progeny. The Union's collection of fees from nonmembers is authorized by an act of legislative grace, not by any inherent "right" of the Union to the possession of nonmembers' funds. *See Davenport*, 551 U.S. at 185. This should be clear to all. In *Davenport*, the Court explained that its agency-fee cases "were not balancing constitutional rights in the manner [the union] suggests, for the simple reason that unions have no constitutional entitlement to the fees of nonmember-employees." *Id.* Along similar lines, the Second Circuit has held that it is error to approach the agency-fee issue "with a balancing test in which the cost to the union and the practicality of the procedures were to be weighed against the dissenters' First Amendment interests." *Andrews v. Educ. Ass'n of Cheshire*, 829 F.2d 335, 339-40 (2d Cir. 1987).

*Davenport* considered a Washington state law prohibiting labor unions from using the agency-shop fees of nonmembers for election-related purposes unless the nonmember affirmatively consented. 551 U.S. at 185. The Court considered whether this restriction on a union's spending of agency fees, as applied to public-sector labor unions, violated the First Amendment. The Court emphatically determined that the restriction did not: "[t]he notion that this modest limitation upon an extraordinary benefit violates the First Amendment is, to say the least, counterintuitive." *Id*. at 184. The union had no right to the funds; instead, "[w]hat matters is that public-sector agency fees are in the union's possession only because Washington and its union-contracting government agencies have compelled their employees to pay those fees." *Id*. at 187.

Viewed properly, the collection of agency fees is authorized by legislative policy considerations pertaining to labor relations. *Locke*, 129 S. Ct. at 803; *Abood*, 431 U.S. at 222. There are several justifications for an agency shop, but only one is implicated in this case: to prevent free-riding by nonmembers who benefit from the union's collective bargaining activities. *See Davenport*, 551 U.S. at 181 (describing the "primary purpose" of agency-shop arrangements as preven-

tion of free-riding by nonmembers); *see also Abood*, 431 U.S. at 222; *Ellis*, 466 U.S. at 447-48. Political and ideological expenditures fall outside "the reasons advanced by the unions and accepted by Congress why authority to make union-shop agreements was justified." *Lehnert*, 500 U.S. at 554, *quoting Street*, 367 U.S. at 768.

Thus, the majority is mistaken. The Union's interest in this case is not a "right" to nonmembers' funds. The Union's interest lies in receiving a fair contribution to its collective bargaining expenses. The Union has no legitimate interest, however, in collecting agency fees from nonmembers to fill its political war-chest.

## 2.

The majority describes *Hudson* as a "reasonable accommodation test." The majority points to the following statement from *Hudson:* "[t]he objective must be to devise a way of preventing compulsory subsidization of ideological activity by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities." 475 U.S. at 302. The majority also states that a union need not take "any and all steps demanded by fee payers." The majority looks to our decision in *Grunwald v. San Bernardino City Unified School District*, which stated: "[t]he test . . . is not whether the union and the [employer] have come up with the system that imposes the least burden on agency fee payers, regardless of cost." 994 F.2d 1370, 1376 n.7 (9th Cir. 1993).

But there is a wide gap between taking "any and all steps demanded by fee payers" — that is, a least-restrictive means test — and what the majority endorses. While *Hudson* does not require a union to adopt procedures that impose the least intrusive burden on fee payers possible, the majority affords the union undue leniency. *See*, *e.g.*, *Andrews*, 829 F.2d at 339-40. The majority ignores *Hudson*'s instruction that,

because employees' First Amendment interests are implicated by the collection of an agency fee, "the procedure [must] be *carefully tailored* to minimize the infringement." *Hudson*, 475 U.S. at 302-03 (emphasis added). To eliminate any doubt, in the footnote appended to this statement, the Court cites several cases holding that when First Amendment rights are implicated, the government must avoid burdening those rights. *Id.* at 303, n.11, citing *Roberts v. United States Jaycees*, 468 U.S. 609, 637 (1984); *Elrod v. Burns*, 427 U.S. 347, 363 (1976); *Kusper v. Pontikes*, 414 U.S. 51, 58-59 (1973); *NAACP v. Button*, 371 U.S. 415, 438 (1963).

*Hudson* emphasized, moreover, that "procedural safeguards often have a special bite in the First Amendment context." 475 U.S. at 302 n.12 (internal quotation marks and alteration omitted). In the agency fee context, *Hudson* described the goal of procedural protections as to "minimize the risk that nonunion employees' contributions might be used for impermissible purposes" *even temporarily*, *id.* at 305, 309, and to "facilitate a nonunion employee's ability to protect his rights," *id.* at 307 n.20. I therefore conclude that the majority's "reasonable accommodation test" is misguided and is inconsistent with case law that we are required to follow.

## II.

The Union's procedures in this case should be evaluated in light of the principles set forth in *Hudson* and the legitimate interests at stake. As the majority has already set forth the facts of this case in some detail, I recite them only where particularly relevant to my views or where additional detail is warranted. I also seek to draw more attention to the well-reasoned decision of the district court.

## A.

Pursuant to *Hudson,* the Union issues a notice to agency fee payers every June. At issue in this case is the Union's June

2005 *Hudson* notice. That notice set the agency fee to be extracted from nonmember's paychecks at 99.1% of full union membership dues. Nonmembers who objected to paying for nonchargeable expenses would pay a reduced agency fee, set at 56.35% of full union membership dues. The agency fees described in the notice were in effect until the following July, when a new *Hudson* notice was to become effective. The June 2005 *Hudson* notice also provided an objection period of thirty days, during which nonmember fee payers could object to the collection of the full agency fee and elect to pay the reduced agency fee. Some of the plaintiffs in this action objected to the June 2005 *Hudson* notice, while others did not.

In the Summer of 2005, shortly after the expiration of the period for objection to the June 2005 *Hudson* notice, the Union's legislative bodies began discussing a temporary dues increase. The proposal was described as an "Emergency Temporary Assessment to Build a Political Fight-Back Fund." The agenda for a July 30, 2005 Council Meeting described the purpose of the assessment as follows: "[t]he funds from this emergency temporary assessment will be used specifically in the political arenas of California to defend and advance the interests of members of Local 1000 . . . ." The agenda continued to describe:

> These temporary emergency assessments are made necessary by political attacks on state employees and other public workers launched by Governor Schwarzenegger and his allies which threaten the wages, benefits and working conditions of Local 1000 members, and undermine the services they provide to the people of California.

The Union contemplated that the "Political Fight-Back Fund" would not be used for the "regular costs of the union . . . such as office rent, staff salaries or routine equipment replacement." Instead, the Fund would be used "for a broad range of political expenses."

The Union approved the temporary assessment at the end of August 2005. The Union's yearly *Hudson* notice had been issued in June 2005, and that notice did not mention the possibility of the later-enacted temporary assessment. After passage of the temporary assessment, the Union sent a letter to members and nonmembers, dated August 31, 2005, informing them that "Local 1000 delegates voted overwhelmingly for a temporary dues increase to create a Political Fight-Back Fund." The letter stated that the funds collected from the dues increase would be used for several political purposes: (1) to defeat two propositions appearing on the November 2005 ballot (Propositions 75 and 76); (2) to "defeat another attack on [the] pension plan" in June 2006; and (3) "[i]n November 2006 . . . to elect a governor and legislature who support public employees and the services [they] provide." The letter explained that the $45 per month cap on dues would *not* apply to the temporary assessment. For sake of clarity, I point out that this letter did not constitute "notice" as contemplated in *Hudson*. The letter did not provide an explanation for the basis of the additional fees being imposed, and it did not provide nonmembers with an opportunity to object to the additional fees.

After receiving the Union's letter, some nonmembers attempted to object to the temporary assessment. For example, plaintiff Dobrowolski contacted the Union to lodge his objection to the "Political Fight-Back Fund." He was told, in effect, that there was nothing he could do about it; he was not allowed to object. The Union thereafter sent a letter to nonmembers, like plaintiff Dobrowolski, who attempted to object to the increase in fees. That letter, dated October 27, 2005, stated in part:

> The Union has received your objection to the dues increase. We understand that you are a political objector and a fee payer in the Union and that you have raised an objection to paying this increase because you believe the money will be directed

solely to political activities by the Union. We understand your frustration about paying a little more to the Union when you have not seen a new contract with a pay increase. However, we hope that by explaining the Union's position concerning this dues and fees increase, you will better understand our position. . . .

When we have a campaign that is split between political actions and collective bargaining actions the Union is required by law to annually audit the expenditures for those activities; the Union will fully comply with this requirement. However, the Supreme Court has stated that this audit must occur at the end of the fiscal year in which the activities take place, because next year's objecting fee-payer rate must be based on that audit.

This campaign will entail much workplace organizing divided over two fiscal years. At the end of each year, the Union's expenses for these activities will be audited, and the amount of expense which is not germane to collective bargaining will be used to set the objecting fee-payer rate for the next year. Presently you are an objecting fee-payer who pays the audited rate for this year. Next year, you will be able to exercise your objection again and pay the audited rate set for that year, based on the Union's expenditures this year. That rate will fully account for any political actions of the nature to which you have objected.

The temporary assessment took effect at the end of September 2005. At that time, the Controller of the State of California, defendant Steve Westly, began deducting the additional fees automatically from all nonmember employees' paychecks. Although the assessment was "temporary," it was cer-

tainly not of short duration, lasting from September 2005 until the end of December 2006.

**B.**

In November 2005, plaintiffs initiated this action in the United States District Court for the Eastern District of California, contending that the temporary assessment violated their First, Fifth and Fourteenth Amendment rights. Plaintiffs alleged, among other things, that the temporary assessment constituted a seizure of their money for nonchargeable political expenses, without constitutionally required procedural safeguards. The district court granted a preliminary injunction to plaintiffs. On cross-motions for summary judgment, the district court entered summary judgment in plaintiffs' favor.

There are several important features of the district court's summary judgment. First, the district court addressed the burden imposed by the temporary special assessment. The Union argued that nonmembers who had objected to the June 2005 Hudson notice were assessed only a 14.09% increase in the deduction from the objector's salary. The district court opined that the figure was "somewhat misleading" because it ignored the fee increase imposed on nonunion employees who had not objected to the Union's June 2005 *Hudson* notice. The district court indicated that the Union's quantification of the temporary assessment was misleading in other respects as well, and that the actual increase in fair share fee for nonmembers ranged, on average, from 25% to 33%. The district court deemed this "a material change in the amount of funds nonunion employees were required to contribute to Union expenditures." The district court concluded, "the fair share fees paid by both objectors and nonobjectors actually increased by a much greater margin than Defendants would like to suggest."

Second, the district court discussed the characterization of the temporary special assessment. Plaintiffs asserted that the fund was intended solely for political and ideological pur-

poses. The Union characterized the assessment as "an ordinary dues and fees increase" because, in retrospect, some of the expenses funded through the temporary assessment were eventually deemed chargeable to nonmembers. The district court thought the Union's position "def[ied] logic." The Union had described the proposed assessment as a political fund, and specifically stated that the fund was not to be used for regular costs.

Third, taking all of the above together, the district court concluded that the June 2005 notice did not provide potential objectors with sufficient information to gauge the propriety of the Union's fee, in light of the temporary special assessment. The June 2005 *Hudson* notice could not provide adequate notice as to the temporary assessment because it relied on categories that were not relevant to the temporary assessment. According to the Union's statements, the temporary special assessment was intended for a specific purpose and would not be used for regular expenses. The district court pointed out that, "after implementing the increase, the Union took the position that nonunion employees had already been given an opportunity to make an informed decision as to the Assessment by means of the 2005 Hudson notice. The Union now turns a blind eye to the inconsistency inherent in asking nonunion employees to compare apples, in the form of the prior year's financials, to oranges, in the form of a new Assessment."

Finally, the district court concluded that the appropriate remedy was a second *Hudson* notice, relying on *Wagner v. Professional Engineers in California Government*, 354 F.3d 1036, 1041 (9th Cir. 2004). This remedy had to be made available to nonmembers regardless of whether they had objected to the June 2005 *Hudson* notice, because: "[i]n order for any nonunion employees' failure to object to have any legal significance, the 2005 *Hudson* Notice must have been valid and sufficient to cover the Assessment." The district

court held that objectors to the second *Hudson* notice would be entitled to a refund, with interest, of any withheld amounts.

## III.

In this case, the Union failed to protect adequately the First Amendment rights of nonmembers from whom it collected an agency fee. In collecting agency fees from nonmembers, the Union is subject to constraints that are both procedural and substantive in nature. *See Grunwald*, 994 F.2d at 1373. Procedurally, the Union did not provide nonmembers with sufficient information to gauge the propriety of the agency fee. The Union's June 2005 *Hudson* notice was insufficient in light of the temporary assessment. Notably, the Union adopted no other procedures to protect nonmembers' First Amendment rights upon imposition of the temporary assessment. Nonmembers were provided no additional notice, opportunity to object, dispute resolution procedure, and so forth. Compounding these procedural failures, there is a substantive problem. The temporary assessment is suspect, because it was instituted shortly after the June general *Hudson* notice and was explicitly and exclusively intended to fund the Union's political activities. The temporary assessment was a special purpose fund that would not be used for regular Union costs and therefore represented a departure from the Union's typical spending regime.[1] I do not believe the Union sufficiently minimized the risk that nonmembers' funds would be used to subsidize political and ideological activities in light of these circumstances.

---

[1]The majority avers that the special assessment does not represent a substantial departure from the Union's ordinary spending. Subsequent audits, however, revealed that a very substantial portion of the Union's assessment, 72.6% in 2005 and 81.2% in 2006, was used for non-chargeable purposes. In contrast, 31.2% of the Union's total expenses was determined to be non-chargeable in 2005, and 39.6% was deemed non-chargeable in 2006. The special assessment, therefore, cannot be described as being consistent with the Union's usual spending — especially when the Union explicitly stated that the assessment was necessary for political purposes.

## A.

I first consider the adequacy of the Union's June 2005 *Hudson* notice in light of the temporary assessment. The June 2005 *Hudson* notice provided, in part:

> Effective July 1, 2005 through June 30, 2006, the fee will be no more than 99.1% of regular membership dues. Regular monthly membership dues are currently 1.0% of monthly gross salary and are presently capped at a maximum of $45 per month. Dues are subject to change without further notice to fee payers.

> Effective July 1, 2005 through June 30, 2006 (the "2005-6 Fee Payer Year") [the Union] will charge fee payers who object to expenditures not germane to collective bargaining a fee of no more than 56.35% of regular membership dues for that salary level.

The notice provided, in addition, for a "Political Action Reduction:" "Fee payers are also entitled to have their fees reduced by the pro rata portion of the fee that goes to the Political Action Fund that [the Union] sets aside for contributions to candidates and initiative campaigns, and other partisan political activities."

To provide a point of comparison, the Union's June 2006 Hudson notice, issued after the temporary assessment had been enacted, provided as follows:

> Effective July 1, 2006 through June 30, 2007, the fee will be no more than 99.1% of regular membership dues. Regular monthly membership dues are currently 1.0% of monthly gross salary and are presently capped at a maximum of $45 per month. Additionally, a temporary assessment of 1/4 of 1% of

> monthly gross salary is being collected through December 31, 2006. Dues are subject to change without further notice to fee payers.

> Effective July 1, 2006 through June 30, 2007 (the "2006-7 Fee Payer Year") [the Union] will charge fee payers who object to expenditures not germane to collective bargaining a fee of no more than 68.8% of regular membership dues for that salary level.

Regarding the "Political Action Fund," the 2006 *Hudson* notice provided that fee payers were also entitled "to have their fees reduced by the pro rata portion of the fee that goes to the Political Action Fund. . . ."

The Union submits that the Supreme Court has approved the retrospective method by which it calculates the yearly agency fee: a "look-back" procedure, by which the Union sets the agency fee for the upcoming year according to the proportion of chargeable versus nonchargeable expenditures in the prior year. However, the Union's June 2005 *Hudson* notice was not adequate to provide an explanation of the basis for the agency fee extracted from nonmembers' paychecks for the temporary assessment. To reiterate the obvious, the June 2005 *Hudson* notice provided no information regarding the temporary assessment, as it was enacted subsequently, in August 2005. The Union would respond that the notice was adequate to cover such future contingencies. How could that be? The temporary special assessment resulted in approximately a 25% increase in fair share fees — a fairly substantial increase. Because the temporary assessment was exempted from the dues cap, higher-earning employees might experience an effective or actual increase that was even greater. Moreover, while the assessment was "temporary," it was in effect for the bulk of the 2005 fee year, from the end of September 2005 until commencement of the next fee year in July 2006.

The district court further held that the fee increase was material, and I agree. The temporary special assessment might

therefore have affected a fee payer's decision to object pursuant to the June 2005 *Hudson* notice. *See*, *e.g.*, *Dashiell v. Montgomery County*, 925 F.2d 750, 756 (4th Cir. 1991) ("The test of adequacy of the initial explanation to be provided by the union is . . . whether the information is sufficient to enable the employee to decide whether to object"). Indeed, because the Union refused to give nonmember employees an opportunity to object when information about the temporary assessment was disclosed, these nonmembers were essentially left in the "dark" about the nature of the agency fee during the time period in which they were required to file objections. *See Hudson*, 475 U.S. at 303 (emphasizing that unions cannot leave "nonunion employees in the dark about the source of the figure for the agency fee"). In other words, even though the special assessment significantly altered the magnitude and intended use of the agency fee, the Union and the majority believe that nonmember employees were required to object *before* the material information was revealed. Such an approach simply cannot be reconciled with the procedures set forth in *Hudson*. *See id.*; *cf. Locke v. Karass*, 382 F. Supp. 2d 181, 190 (D. Me. 2005) (explaining that the use of a previous year's financial audit to set the percentage of chargeable fees would violate *Hudson*, when a union "cherry pick[s]" certain financial data, and fails to disclose other material information, in an effort to increase fees), *affirmed by* 498 F.3d 49 (2007) *and by* 129 S. Ct. 798 (2009).

The Union would respond, I venture, by asserting that the temporary assessment did not alter the agency fee as a percentage of total union dues. The June 2005 *Hudson* notice disclosed that the agency fee was 99.1% of membership dues, and that the objectors' agency fee was 56.35% of membership dues. The temporary assessment did not affect these percentages. But such an argument rests on the faulty premise that, if nonmembers' fees remain constant as a percentage of members' dues through a given fee year, any absolute increase in fees is protected from scrutiny by the yearly *Hudson* notice, that is, that the proportionate share is what matters, and

because this was not altered there can be no constitutional violation.

I am not convinced that the proportionate share is all that matters in evaluating the adequacy of a *Hudson* notice. From the standpoint of a potential objector, the magnitude of the increase in fees imposed by the temporary assessment could very well be material. This increase, as an absolute amount, could affect a nonmember's decision to object or not to object even if the percentage fee remained static. And these non-members are the ones whose First Amendment rights are in jeopardy — not the Union's. Moreover, the temporary assessment was *exempted* from the cap on dues. Thus, even though the fair share fee remained constant as a basic percentage under the temporary assessment, because the assessment was exempted from the $45 per month cap on dues, some employees would in fact experience a proportionately greater share in monthly fee deductions. This is inconsistent with a static-percentage justification for the Union's failure to provide additional notice regarding the temporary assessment.

Furthermore, by exempting the temporary assessment from the cap, the Union acted contrary to the June 2005 *Hudson* notice. The June 2005 *Hudson* notice, stated: "currently 1.0% of monthly gross salary and are presently capped at a maximum of $45 per month." Exceptions from the cap, or the elimination of it, was not contemplated in the June 2005 *Hudson* notice. The Union's June 2005 *Hudson* notice also stated: "[d]ues are subject to change without further notice to fee payers." I cannot put much weight in this sweeping reservation of assumed authority; in any event, the notice did not disclose that the cap could be eliminated. For these additional reasons, I conclude that the temporary assessment might be a material factor in a nonmembers' decision to object.

I conclude that the Union's June 2005 notice did not fulfill its obligations under *Hudson*. The purpose of a *Hudson* notice is to enable informed consent or objection. *See Cummings v.*

*Connell*, 316 F.3d 886, 895 (9th Cir. 2003), *cert. denied*, 539 U.S. 927 (2003) (holding that the *Hudson* notice was designed to provide nonmembers with information necessary to evaluate whether to object to a union's calculation of chargeable expenses); *Hohe v. Casey*, 956 F.2d 399, 410 (3d Cir. 1992) ("the issue is whether the notice provided nonmembers with . . . sufficient information to determine whether they were only being compelled to contribute to chargeable activities"). The Union's June 2005 *Hudson* notice was inadequate to provide fee payers with a basis on which to adjudge the propriety of the Union's agency fee, and to decide whether or not to object.

Because the Union's June 2005 *Hudson* notice was inadequate, an employee's failure to object to it does not constitute an effective waiver, an abandonment of a known right. *Lowary v. Lexington Local Bd. of Educ.*, 903 F.2d 422, 430 (6th Cir. 1990). Until *Hudson's* requirements are satisfied, employees must be afforded subsequent opportunities to object. *See Mitchell v. L.A. Unif. Sch. Dist.*, 963 F.2d 258, 261-63 (9th Cir. 1992).

The June 2005 *Hudson* notice was not adequate to provide notice as to the temporary assessment for an additional reason, which warrants separate attention. The temporary assessment was a special purpose fund. The Union envisioned the temporary assessment as a political fundraising vehicle, to build a "Political Fight-Back Fund." The Union contemplated that the temporary assessment would provide a distinct source of capital for political activities and that it would not be used for the regular expenses of the union.[2] Recognizing the unique character of the temporary assessment has two implications.

---

[2]The majority acknowledges that the Union's August 2005 letter to members and agency fee payers specifically stated that the fee increase would be used for political activities. In fact, that letter makes no mention whatsoever of any non-political reason for the increase. Nevertheless, based on the October 2005 letter, the majority reasons that the Union "in-

First, the June 2005 *Hudson* notice could not be adequate to enable nonmembers' informed objection to the agency fee. The June 2005 *Hudson* notice contemplated ordinary expenditures; the temporary special assessment stood apart from that. As the district court stated, the union asked nonmembers to compare "apples, in the form of the prior year's financials, to oranges, in the form of a new [a]ssessment, an [a]ssessment which was not to be utilized for Union operations but was instead earmarked for discrete political purposes." Even if agency fees remained constant as a percentage of total member dues, nonmembers might well object to paying increased fees for purely political purposes; for example, they might object in light of the departure from the Union's normal spending regime.

Second, as a substantive matter, the Court has repeatedly stressed that a union may extract from nonmembers "only

---

tended to split the increase 'between political actions and collective bargaining actions.' " Maj. Op. at 19881. The October letter, however, does not state that the *fee increase* would be split between political and collective bargaining activities. Instead, the letter indicates that the Union would be undertaking a "year-long *campaign*" that would be "split" between both political and non-political functions. Nothing in the letter states that the "campaign" would be funded exclusively by the assessment. In fact, the Union's letter then identified a 2004 "Call the Governor" program, which apparently was funded by the Union's general fund from the previous year, as an example of a non-political "campaign" activity. Thus, when the August and October letters are read together, it appears the Union intended to use the fee increase to fund political aspects of the campaign, while it intended to fund non-political activities with general member and agency fees.

Similarly, the majority misapprehends the record when it suggests that the fee assessment contained no spending limitations. Maj. Op. at 19881-82. When the Union decided to increase fees, its budget committee indicated that the increase would "not be used for regular costs of the [U]nion." The agenda for the counsel meeting, wherein the Union resolved to increase fees, further states that "[t]he funds from this emergency temporary assessment will be used specifically in the political arenas of California." These appear to be spending limitations.

those fees and dues necessary to performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues." *Price*, 927 F.2d at 90-91 (internal quotation marks omitted). In *Lehnert*, the Court outlined a framework for evaluating whether an activity was germane to a union's role as exclusive bargaining agent: "chargeable activities must (1) be 'germane' to collective-bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding 'free riders'; and (3) not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop." 500 U.S. at 519.

To protect the distinction between chargeable and non-chargeable activities, a union is required to adopt procedures that minimize the risk that nonmembers will be compelled to subsidize political or ideological activities with which they do not agree.[3] In *Hudson*, the Court explained, "[t]he Union

[3]The majority incorrectly concludes that Plaintiffs' appeal "must fail" because chargeability of the assessment is "immaterial" to their procedural *Hudson* challenge. Maj. Op. at 19887 n.4. While it is true that the Plaintiffs in this case do not raise a direct challenge to the Union's chargeability determinations, this does not mean that the political nature of the Union's special assessment is irrelevant. Indeed, the *Hudson* procedures were adopted to provide nonunion employees with a fair opportunity to object to a union's use of agency fees for political, ideological, and otherwise non-chargeable activities. *See* 475 U.S. at 306 ("Basic considerations of fairness, as well as concern for the First Amendment rights at stake, . . . dictate that the potential objectors be given sufficient information to gauge the propriety of the union's fee"). Here, the Union's decision to raise fees to fund political activities is relevant in determining whether the Union provided sufficient information for nonunion employees to "gauge" whether or not to object.

The majority's reliance on *Wagner*, 354 F.3d at 1046-47, is mispled. While *Wagner* observed that a procedural *Hudson* challenge raises different questions than a challenge to a union's chargeability determinations, *Wagner* does not stand for the proposition that the potential chargeability of a union's mid-year fee increase cannot be considered in determining whether a union has satisfied the procedural requirements set forth in *Hudson*. *See id.*; *Hudson*, 475 U.S. at 306.

should not be permitted to exact a service fee from nonmembers without first establishing a procedure which will avoid the risk that their funds will be used, even temporarily, to finance ideological activities unrelated to collective bargaining." *Hudson*, 475 U.S. at 305; *Abood*, 431 U.S. at 244 (concurring opinion).

The temporary assessment was contemplated as a political fundraising vehicle; it therefore cannot be justified by the interest in preventing nonmembers from free-riding on the Union's collective bargaining efforts. The temporary assessment clearly burdened the speech of nonmembers. But the Union undertook no efforts, in connection with the imposition of the temporary assessment, to minimize the impact on nonmembers' First Amendment rights. Taking these considerations together, I conclude that, in connection with the imposition and collection of the temporary assessment, the Union did not fulfill its obligation to be mindful of nonmembers' First Amendment rights.

The Union and the majority seek to evade the fact that the temporary assessment was enacted to fund political activities by arguing that the fund was ultimately used for some expenses that were chargeable to nonmembers.[4] I agree with

---

[4]The Union's ideological challenge to Proposition 76 cannot be categorized, as the majority attempts, as an expense chargeable to objecting agency-fee payers. According to the majority, expenses related to the Union's political challenge to this ballot measure might be considered chargeable because Proposition 76 "would have effectively permitted the Governor to abrogate the Union's collective bargaining agreements under certain circumstances." Maj. Op. at 19882 n.2. A review of Proposition 76, however, reveals that any connection between the Union's challenge was too attenuated to its collective bargaining agreement to be considered a chargeable expense. The purpose of the ballot measure was to limit the annual amount of total state spending to the prior year's spending plus a reasonable amount of growth. *See* Sec'y of the St. of Cal., *Official Voter Information Guide: Special Statewide Election* 60 (2005). It also would have set aside budget surpluses for future use. *Id.* To achieve these initia-

the district court's assessment of the Union's post hoc rationalization: "[f]ollowing the union's logic it should be required only to show that some small fraction of this fund was used for chargeable purposes in order to justify subverting its *Hudson* responsibilities." The district court further reasoned that, even if the temporary assessment was not intended *solely* for political purposes, it was indeed intended *predominantly* for political purposes. As such, the district court continued, "it is clear that the Union's intent was to depart drastically from its typical spending regime and to focus [the temporary special assessment funds] on activities that were political or ideological in nature."

---

tives, Proposition 76 allowed the governor to reduce spending under certain circumstances. For instance, if passed, the proposition would have given the Governor limited "authority to reduce appropriations" for future state contracts, collective bargaining agreements, and entitlement programs. *Id.* Thus, properly understood Proposition 76 was a ballot measure related to the allocation of tax revenue for funding government activities, which included the amount of financial support available to fund public employment. *See id.*

To be sure, there are some limited circumstances where a union's political activities can be deemed chargeable. According to the Supreme Court, lobbying or other political activities are chargeable when they directly relate to "ratification of negotiated agreements by the proper . . . legislative body" or "to acquiring appropriations for approved collective-bargaining agreements." *Lehnert*, 500 U.S. at 520. Where, however, as in the instant case, the "challenged . . . activities relate . . . to financial support of . . . public employees generally, the connection to the union's function as bargaining representative is too attenuated to justify compelled support by objecting employees." *Id.* Accordingly, contrary to the majority's contention, the district court and I do not "conflate" political expenses with non-chargeable expenses. Maj. Op. at 19882 n.2. We simply recognize that the Union's intended uses for the assessment, all of which pertained to core political activities such as the Union's challenge to Proposition 76, cannot be construed as legally chargeable. Additionally, it is peculiar that the majority even makes the assertion that the Union's political expenses would be chargeable if, as the majority avers, "chargeability is immaterial" to the instant case. Maj. Op. at 19887 n.4.

In sum, the Union's procedures were not adequate under the circumstances. The June 2005 *Hudson* notice was inadequate to provide nonmembers with sufficient information from which to evaluate the propriety of the Union's agency fee. After enacting the temporary special assessment, the Union made no effort whatsoever to minimize the infringement of nonmembers' rights. The Union did not provide notice regarding the temporary assessment; the Union also did not provide nonmembers with an opportunity to object to the temporary assessment. The Union did not provide a procedure for resolving disputes and did not place disputed amounts in escrow. Indeed, when nonmembers attempted to object to the temporary assessment, they were refused a forum for their dispute and were never provided with the opportunity to obtain the decision of a neutral hearing officer.

## IV.

This brings me to the crux of the Union's argument: that *Hudson* approved calculating an agency fee as the proportion of chargeable to nonchargeable expenses in the prior fiscal year. The Union asserts that the prior-year method is virtually required here, as it is a large public sector union and must calculate its agency fee on the basis of audited financial reports. Because of the audit requirement, moreover, the Union asserts that it could not prospectively apportion the temporary assessment between chargeable and nonchargeable expenses.

The majority agrees that the Union complied with its obligations. The majority recites that "absolute" precision cannot be expected or required in the calculation of an agency fee, and that the Union cannot be "faulted" for calculating its agency fee on the basis of the prior fiscal year's expenditures. Further, the majority states that the Union could not deviate from the prior-year method of calculating the agency fee with respect to the special assessment. The majority explains that the prior-year method makes lag inherent; in any given year, an objector might be "underpaying or overpaying," but "the

inevitable effect of the *Hudson* method is that these over- and undercharges even out over time."

This strikes me as a strange argument when dealing with a First Amendment challenge. First, the *Hudson* notice procedure is not per se adequate to protect the rights of nonmembers in all situations. Instead, where, as here, there is a substantial deviation from the normal *Hudson* process, adaptation is required. Second, the prior-year calculation method does not establish the adequacy of the June 2005 *Hudson* notice nor does it demonstrate that the Union's procedures were adequate when viewed as a whole.

## A.

We should not measure the Union's conduct by the discrete *Hudson* procedures alone. *Hudson* establishes a floor. *See Keller v. State Bar of Cal.*, 496 U.S. 1, 17 (1990). In *Davenport*, the Court stressed, "we have described *Hudson* as 'outlin[ing] a *minimum* set of procedures by which a [public-sector] union in an agency-shop relationship could meet its requirement under *Abood*.' " 551 U.S. at 185.

Here, the temporary assessment was not like the Union's ordinary dues and not like the facts presented in *Hudson*. Several features of the special assessment distinguish this case. The temporary assessment was imposed mid-year and not in the normal course of the *Hudson* process. The temporary assessment imposed a material increase in agency fees over those contemplated in the *Hudson* notice, and was exempt from the dues cap (which was inconsistent with the *Hudson* notice). *Hudson* did not consider a fee increase outside of a normal periodic notice process. Likewise, *Hudson* did not contemplate a special-purpose assessment, as here. Even assuming the Union did here what was done in *Hudson*, it could not be sufficient to satisfy its duties in light of the unique circumstances of this case.

I cannot agree with the proposition that the Union's June 2005 *Hudson* notice satisfied the Union's obligations to non-members until issuance of the next yearly *Hudson* notice. The Union's mid-year conduct cannot be insulated from scrutiny. Rather, there must be some limitation on a union's imposition of fee increases between *Hudson* annual notices.

**B.**

The Union contends that it complied with the procedures set forth in *Hudson*, because the Court approved the calculation of an agency fee based on the proportion of the prior year's chargeable to nonchargeable expenditures. Indeed, in a footnote, the Court stated that a union "cannot be faulted for calculating its fee on the basis of its expenses during the preceding year." *Hudson*, 475 U.S. at 307 n.18. The Union represents, furthermore, that its hands were tied with regard to the temporary assessment, because it is required to base its agency fee calculation on audited financial statements. *See Knight v. Kenai Peninsula Borough Sch. Dist.*, 131 F.3d 807, 812-13 (9th Cir. 1997), *cert. denied*, 524 U.S. 904 (1998); *Prescott v. County of El Dorado*, 177 F.3d 1102, 1006-09 (9th Cir. 1999), *vacated and remanded on other grounds*, 528 U.S. 1111, *reinstated*, 204 F.3d 984 (9th Cir. 2000).

The prior-year calculation method used here does not satisfy all of the Union's obligations, however. The Union's allocation of expenses as chargeable or nonchargeable presents a distinct issue in the adequacy of its *Hudson* notice. *See, e.g.*, *Seidemann v. Bowen*, 499 F.3d 119, 127 (2d Cir. 2007) (there is a "clear distinction between the adequacy of a union's notice . . . and the propriety of a union's chargeability determinations"); *Hudson v. Chicago Teachers Union*, 922 F.2d 1306, 1309, 1314 (7th Cir. 1991) (pointing out that a party had confused adequacy of the notice with the accuracy of the fee itself). Thus, even if the Union "cannot be faulted" for relying on prior-year expenditures in calculating the agency fee, it is not relieved from its other *Hudson* obliga-

tions. The Union must still provide adequate notice to enable an informed decision, an opportunity to lodge objections, a prompt hearing on objections by a neutral decisionmaker, and escrow of any amounts in dispute. Even if we look only to compliance with *Hudson*, therefore, the Union still falls short of the mark.

I recognize that the Union, in relying on prior-year expenditures as the basis for its agency fee, is subject to an audit requirement. In my view, application of the audit requirement relates to the appropriate remedy in this case, a question we do not reach. A district court, with a proper record, could evaluate the audit requirement in light of the temporary assessment. Indeed, the purpose of an audit is to verify that a union actually spent the amount of money it claims; the audit is not intended to verify the union's allocation as a "legal, not an accounting, decision regarding the appropriateness of the allocation of expenses to the chargeable and non-chargeable categories." *Andrews*, 829 F.2d at 340; *accord Gwirtz v. Ohio Educ. Ass'n*, 887 F.2d 678, 682 n.3 (6th Cir. 1989); *Ping v. Nat'l Educ. Ass'n*, 870 F.2d 1369, 1374 (7th Cir. 1989). In any event, the audit requirement does not relate to the other *Hudson* protections implicated by this case, and is ultimately of limited help to the Union. Even a temporary violation of the First Amendment is a significant violation.

## V.

The majority construes the issue in this appeal as "whether a union is required . . . to send a second notice when adopting a temporary, mid-term fee increase." By framing narrowly the issue in this case, the majority shifts attention to the remedy adopted by the district court. But the district court's remedy is only one consideration in this case — one we do not even reach — and should not be set up as a strawman for attack.

In this case, the Union's provision of an annual *Hudson* notice was insufficient to enable nonmembers to protect their

First Amendment rights upon imposition of the temporary assessment. The Union, furthermore, made no effort to minimize the infringement of nonmember's First Amendment rights despite substantially increasing the fees extracted from their paychecks. I believe that the majority's opinion does not carry out the principles of *Hudson*. I therefore dissent.