(Slip Opinion) OCTOBER TERM, 2011 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KNOX ET AL. *v.* SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 1000

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 10–1121. Argued January 10, 2012—Decided June 21, 2012

California law permits public-sector employees in a bargaining unit to decide by majority vote to create an "agency shop" arrangement under which all the employees are represented by a union. Even employees who do not join the union must pay an annual fee for "chargeable expenses," *i.e.,* the cost of nonpolitical union services related to collective bargaining. Under *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209, a public-sector union can bill nonmembers for chargeable expenses but may not require them to fund its political or ideological projects. *Teachers* v. *Hudson*, 475 U. S. 292, 302–311, sets out requirements that a union must meet in order to collect regular fees from nonmembers without violating their rights.

In June 2005, respondent, a public-sector union (SEIU), sent to California employees its annual *Hudson* notice, setting and capping monthly dues and estimating that 56.35% of its total expenditures in the coming year would be chargeable expenses. A nonmember had 30 days to object to full payment of dues but would still have to pay the chargeable portion. The notice stated that the fee was subject to increase without further notice. That same month, the Governor called for a special election on, *inter alia,* two ballot propositions opposed by the SEIU. After the 30-day objection period ended, the SEIU sent a letter to unit employees announcing a temporary 25% increase in dues and a temporary elimination of the monthly dues cap, billing the move as an "Emergency Temporary Assessment to Build a Political Fight-Back Fund." The purpose of the fund was to help achieve the union's political objectives in the special election and in the upcoming November 2006 election. The union noted that the fund would be used "for a broad range of political expenses, including tele-

vision and radio advertising, direct mail, voter registration, voter education, and get out the vote activities in our work sites and in our communities across California." Nonunion employees were not given any choice as to whether they would pay into the fund.

Petitioners, on behalf of nonunion employees who paid into the fund, brought a class action against the SEIU alleging violation of their First Amendment rights. The Federal District Court granted petitioners summary judgment. Ruling that the special assessment was for entirely political purposes, it ordered the SEIU to send a new notice giving class members 45 days to object and to provide those who object a full refund of contributions to the fund. The Ninth Circuit reversed, concluding that *Hudson* prescribed a balancing test under which the proper inquiry is whether the SEIU's procedures reasonably accommodated the interests of the union, the employer, and the nonmember employees.

*Held*:

1. This case is not moot. Although the SEIU offered a full refund to all class members after certiorari was granted, a live controversy remains. The voluntary cessation of challenged conduct does not ordinarily render a case moot because that conduct could be resumed as soon as the case is dismissed. See *City of Mesquite* v. *Aladdin's Castle, Inc.*, 455 U. S. 283, 289. Since the SEIU continues to defend the fund's legality, it would not necessarily refrain from collecting similar fees in the future. Even if concerns about voluntary cessation were inapplicable because petitioners did not seek prospective relief, there would still be a live controversy as to the adequacy of the refund notice the SEIU sent pursuant to the District Court's order. Pp. 6–8.

2. Under the First Amendment, when a union imposes a special assessment or dues increase levied to meet expenses that were not disclosed when the regular assessment was set, it must provide a fresh notice and may not exact any funds from nonmembers without their affirmative consent. Pp. 8–23.

(a) A close connection exists between this Nation's commitment to self-government and the rights protected by the First Amendment, see, *e.g., Brown* v. *Hartlage*, 456 U. S. 45, 52–53, which creates "an open marketplace" in which differing ideas about political, economic, and social issues can compete freely for public acceptance without improper government interference, *New York State Bd. of Elections* v. *Lopez Torres*, 552 U. S 196, 202. The government may not prohibit the dissemination of ideas it disfavors, nor compel the endorsement of ideas that it approves. See, *e.g., R. A. V.* v. *St. Paul,* 505 U. S. 377, 382. And the ability of like-minded individuals to associate for the purpose of expressing commonly held views may not be curtailed. See, *e.g., Roberts* v. *United States Jaycees,* 468 U. S. 609, 623. Close-

ly related to compelled speech and compelled association is compelled funding of the speech of private speakers or groups. Compulsory subsidies for private speech are thus subject to exacting First Amendment scrutiny and cannot be sustained unless, first, there is a comprehensive regulatory scheme involving a "mandated association" among those who are required to pay the subsidy, *United States* v. *United Foods, Inc.,* 533 U. S. 405, and, second, compulsory fees are levied only insofar as they are a "necessary incident" of the "larger regulatory purpose which justified the required association," *ibid.* Pp. 8−10.

(b) When a State establishes an "agency shop" that exacts compulsory union fees as a condition of public employment, "[t]he dissenting employee is forced to support financially an organization with whose principles and demands he may disagree." *Ellis* v. *Railway Clerks,* 466 U. S. 435, 455. This form of compelled speech and association imposes a "significant impingement on First Amendment rights." *Ibid.* The justification for permitting a union to collect fees from nonmembers—to prevent them from free-riding on the union's efforts—is an anomaly. Similarly, requiring objecting nonmembers to opt out of paying the nonchargeable portion of union dues—rather than exempting them unless they opt in—represents a remarkable boon for unions, creating a risk that the fees nonmembers pay will be used to further political and ideological ends with which they do not agree. Thus, *Hudson*, far from calling for a balancing of rights or interests, made it clear that any procedure for exacting fees from unwilling contributors must be "carefully tailored to minimize the infringement" of free speech rights, 475 U. S. 302−303, and it cited cases holding that measures burdening the freedom of speech or association must serve a compelling interest and must not be significantly broader than necessary to serve that interest. Pp. 10−13.

(c) There is no justification for the SEIU's failure to provide a fresh *Hudson* notice. *Hudson* rests on the principle that nonmembers should not be required to fund a union's political and ideological projects unless they choose to do so after having "a fair opportunity" to assess the impact of paying for nonchargeable union activities. 475 U. S., at 303. The SEIU's procedure cannot be considered to have met *Hudson*'s requirement that fee-collection procedures be carefully tailored to minimize impingement on First Amendment rights. The SEIU argues that nonmembers who objected to the special assessment but were not given the opportunity to opt out would have been given the chance to recover the funds by opting out when the next annual notice was sent, and that the amount of dues payable the following year by objecting nonmembers would decrease if the special assessment were found to be for nonchargeable purposes. But this

decrease would not fully recompense nonmembers, who would not have paid to support the special assessment if given the choice. In any event, even a full refund would not undo the First Amendment violations, since the First Amendment does not permit a union to extract a loan from unwilling nonmembers even if the money is later paid back in full. Pp. 14−17.

(d) The SEIU's treatment of nonmembers who opted out when the initial *Hudson* notice was sent also ran afoul of the First Amendment. They were required to pay 56.35% of the special assessment even though all the money was slated for nonchargeable, electoral uses. And the SEIU's claim that the assessment was a windfall because chargeable expenses turned out to be 66.26% is unpersuasive. First, the SEIU's understanding of the breadth of chargeable expenses is so expansive that it is hard to place much reliance on its statistics. "Lobbying the electorate," which the SEIU claims is chargeable, is nothing more than another term for supporting political causes and candidates. Second, even if the SEIU's statistics are accurate, it does not follow that it was proper to charge objecting nonmembers any particular percentage of the special assessment. If, as the SEIU argues, it is not possible to accurately determine in advance the percentage of union funds that will be used for an upcoming year's chargeable purposes, there is a risk that unconsenting nonmembers will have paid too much or too little. That risk should be borne by the side whose constitutional rights are not at stake. If the nonmembers pay too much, their First Amendment rights are infringed. But, if they pay too little, no constitutional right of the union is violated because it has no constitutional right to receive any payment from those employees. Pp. 17−23.

628 F. 3d 1115, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. SOTOMAYOR, J., filed an opinion concurring in the judgment, in which GINSBURG, J., joined. BREYER, J., filed a dissenting opinion, in which KAGAN, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES
_____

No. 10–1121
_____

## DIANNE KNOX, ET AL., PETITIONERS *v.* SERVICE EM-PLOYEES INTERNATIONAL UNION, LOCAL 1000

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 21, 2012]

JUSTICE ALITO delivered the opinion of the Court.

In this case, we decide whether the First Amendment allows a public-sector union to require objecting nonmembers to pay a special fee for the purpose of financing the union's political and ideological activities.

## I
### A

Under California law, public-sector employees in a bargaining unit may decide by majority vote to create an "agency shop" arrangement under which all the employees are represented by a union selected by the majority. Cal. Govt. Code Ann. §3502.5(a) (West 2010). While employees in the unit are not required to join the union, they must nevertheless pay the union an annual fee to cover the cost of union services related to collective bargaining (so-called chargeable expenses). See *Lehnert* v. *Ferris Faculty Assn.*, 500 U. S. 507, 524 (1991); *Machinists* v. *Street*, 367 U. S. 740, 760 (1961).

Our prior cases have recognized that such arrangements represent an "impingement" on the First Amendment rights of nonmembers. *Teachers* v. *Hudson,* 475 U. S. 292,

307, n. 20 (1986).  See also *Davenport* v. *Washington Ed. Assn.*, 551 U. S. 177, 181 (2007) ("[A]gency-shop arrangements in the public sector raise First Amendment concerns because they force individuals to contribute money to unions as a condition of government employment"); *Street*, *supra*, at 749 (union shop presents First Amendment "questions of the utmost gravity").  Thus, in *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977), we held that a public-sector union, while permitted to bill nonmembers for chargeable expenses, may not require nonmembers to fund its political and ideological projects.  And in *Hudson*, we identified procedural requirements that a union must meet in order to collect fees from nonmembers without violating their rights.  475 U. S., at 302–311.  The First Amendment, we held, does not permit a public-sector union to adopt procedures that have the effect of requiring objecting nonmembers to lend the union money to be used for political, ideological, and other purposes not germane to collective bargaining.  *Id.,* at 305.  In the interest of administrative convenience, however, we concluded that a union "cannot be faulted" for calculating the fee that nonmembers must pay "on the basis of its expenses during the preceding year."  *Id.,* at 307, n. 18.

*Hudson* concerned a union's regular annual fees.  The present case, by contrast, concerns the First Amendment requirements applicable to a special assessment or dues increase that is levied to meet expenses that were not disclosed when the amount of the regular assessment was set.

### B

In June 2005, respondent, the Service Employees International Union, Local 1000 (SEIU), sent out its regular *Hudson* notice informing employees what the agency fee would be for the year ahead.  The notice set monthly dues at 1% of an employee's gross monthly salary but capped

monthly dues at $45. Based on the most recently audited year, the SEIU estimated that 56.35% of its total expenditures in the coming year would be dedicated to chargeable collective-bargaining activities. Thus, if a nonunion employee objected within 30 days to payment of the full amount of union dues, the objecting employee was required to pay only 56.35% of total dues. The SEIU's notice also included a feature that was not present in *Hudson:* The notice stated that the agency fee was subject to increase at any time without further notice.

During this time, the citizens of the State of California were engaged in a wide-ranging political debate regarding state budget deficits, and in particular the budget consequences of growing compensation for public employees backed by powerful public-sector unions. On June 13, 2005, Governor Arnold Schwarzenegger called for a special election to be held in November 2005, where voters would consider various ballot propositions aimed at state-level structural reforms. Two of the most controversial issues on the ballot were Propositions 75 and 76. Proposition 75 would have required unions to obtain employees' affirmative consent before charging them fees to be used for political purposes. Proposition 76 would have limited state spending and would have given the Governor the ability under some circumstances to reduce state appropriations for public-employee compensation. The SEIU joined a coalition of public-sector unions in vigorously opposing these measures. Calling itself the "Alliance for a Better California," the group would eventually raise "more than $10 million, with almost all of it coming from public employee unions, including $2.75 million from state worker unions, $4.7 million from the California Teachers Association, and $700,000 from school workers unions."[1]

———————

[1] Marinucci & Wildermuth, Schwarzenegger Adds Prop. 75 to His Agenda, San Francisco Chronicle, Sept. 18, 2005, p. A–17.

On July 30, shortly after the end of the 30-day objection period for the June *Hudson* notice, the SEIU proposed a temporary 25% increase in employee fees, which it billed as an "Emergency Temporary Assessment to Build a Political Fight-Back Fund." App. 25. The proposal stated that the money was needed to achieve the union's political objectives, both in the special November 2005 election and in the November 2006 election. *Id.,* at 26. According to the proposal, money in the Fight-Back Fund would be used "for a broad range of political expenses, including television and radio advertising, direct mail, voter registration, voter education, and get out the vote activities in our work sites and in our communities across California." *Ibid.* The proposal specifically stated that "[t]he Fund will not be used for regular costs of the union—such as office rent, staff salaries or routine equipment replacement, etc." *Ibid.* It noted that "all other public worker unions are in the process of raising the extraordinary funds needed to defeat the Governor." *Id.,* at 27. And it concluded: "Each of us must do our part to turn back these initiatives which would allow the Governor to destroy our wages and benefits and even our jobs, and threaten the well-being of all Californians." *Ibid.* On August 27, the SEIU's General Council voted to implement the proposal.

On August 31, the SEIU sent out a letter addressed to "Local 1000 Members and Fair Share Fee Payers," announcing that, for a limited period, their fees would be raised to 1.25% of gross monthly salary and the $45-per-month cap on regular dues would not apply. *Id.,* at 31. The letter explained that the union would use the fund to "defeat Proposition 76 and Proposition 75 on November 8," and to "defeat another attack on [its] pension plan" in June 2006. *Ibid.* The letter also informed employees that, in the following year, the money would help "to elect a governor and a legislature who support public employees and the services [they] provide." *Ibid.*

After receiving this letter, one of the plaintiffs in this case called the SEIU's offices to complain that the union was levying the special assessment for political purposes without giving employees a fair opportunity to object. An SEIU area manager responded that "even if [the employee] objected to the payment of the full agency fee, there was nothing he could do about the September increase for the Assessment." *Knox* v. *Westly*, No. 2:05–cv–02198, 2008 WL 850128, *3 (ED Cal., Mar. 28, 2008). "She also stated that 'we are in the fight of our lives,' that the Assessment was needed, and that there was nothing that could be done to stop the Union's expenditure of that Assessment for political purposes." *Ibid.* As a consolation, however, those employees who had filed timely objections after the regular June *Hudson* notice were required to pay only 56.35% of the temporary increase.

Petitioners filed this class-action suit on behalf of 28,000 nonunion employees who were forced to contribute money to the Political Fight-Back Fund. Some of the class members had filed timely objections after receiving the regular *Hudson* notice in June, and others had not. Those who had objected argued that it was wrong to require them to pay 56.35% of the temporary assessment, which had been billed as intended for use in making political expenditures that they found objectionable. Those who had not objected after receiving the June *Hudson* notice contended that they should have received a new opportunity to object when the SEIU levied the special assessment for its Political Fight-Back Fund.

The District Court granted summary judgment for the petitioners, finding that the union "fully intended to use the 12 million additional dollars it anticipated to raise for political purposes." 2008 WL 850128, *7. "Even if every cent of the assessment was not intended to be used for entirely political purposes," the court stated, "it is clear that the Union's intent was to depart drastically from its

typical spending regime and to focus on activities that were political or ideological in nature." *Id.,* at \*8. In light of this fact, the court held that it would be inappropriate for the union to rely on previous annual expenditures to estimate that 56.35% of the new fee would go toward chargeable expenses. The court ordered the SEIU to send out a new notice giving all class members 45 days to object and to provide those who objected with a full refund of their contributions to the Political Fight-Back Fund. *Id.,* at \*12.

A divided panel of the Ninth Circuit reversed. *Knox* v. *California State Employees Assn., Local 1000,* 628 F. 3d 1115 (2010). According to the panel majority, *Hudson* prescribed the use of a balancing test. 628 F. 3d, at 1119–1120. The majority therefore inquired whether the procedure that the SEIU employed reasonably accommodated the interests of the union, the employer, and nonmember employees. *Id.,* at 1120–1123. Judge Wallace dissented, arguing that the majority had misinterpreted *Hudson* and sanctioned the abridgment of the First Amendment rights of nonmembers. 628 F. 3d, at 1123–1139.

We granted certiorari. 564 U. S. \_\_\_ (2011).

## II

The SEIU argues that we should dismiss this case as moot. In opposing the petition for certiorari, the SEIU defended the decision below on the merits. After certiorari was granted, however, the union sent out a notice offering a full refund to all class members, and the union then promptly moved for dismissal of the case on the ground of mootness. Such postcertiorari maneuvers designed to insulate a decision from review by this Court must be viewed with a critical eye. See *City News & Novelty, Inc.* v. *Waukesha,* 531 U. S. 278, 283–284 (2001). The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness

would permit a resumption of the challenged conduct as soon as the case is dismissed. See *City of Mesquite* v. *Aladdin's Castle, Inc.*, 455 U. S. 283, 289 (1982). And here, since the union continues to defend the legality of the Political Fight-Back fee, it is not clear why the union would necessarily refrain from collecting similar fees in the future.

The union argues that concerns about voluntary cessation are inapplicable in this case because petitioners do not seek any prospective relief. See Motion to Dismiss as Moot 11–12. But even if that is so, the union's mootness argument fails because there is still a live controversy as to the adequacy of the SEIU's refund notice. A case becomes moot only when it is impossible for a court to grant "'"any effectual relief whatever" to the prevailing party.'" *Erie* v. *Pap's A. M.*, 529 U. S. 277, 287 (2000) (quoting *Church of Scientology of Cal.* v. *United States,* 506 U. S. 9, 12 (1992), in turn quoting *Mills* v. *Green*, 159 U. S. 651, 653 (1895)). "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Ellis* v. *Railway Clerks*, 466 U. S. 435, 442 (1984).

The District Court ordered the SEIU to send out a "proper" notice giving employees an adequate opportunity to receive a full refund. 2008 WL 850128, *12. Petitioners argue that the notice that the SEIU sent was improper because it includes a host of "conditions, caveats, and confusions as unnecessary complications aimed at reducing the number of class members who claim a refund." Brief for Petitioners in Opposition to Motion to Dismiss 19. In particular, petitioners allege that the union has refused to accept refund requests by fax or e-mail and has made refunds conditional upon the provision of an original signature and a Social Security number. *Id.*, at 18–19. As this dispute illustrates, the nature of the notice may affect how many employees who object to the union's special

assessment will be able to get their money back. The union is not entitled to dictate unilaterally the manner in which it advertises the availability of the refund.

For this reason, we conclude that a live controversy remains, and we proceed to the merits.

## III

### A

Our cases have often noted the close connection between our Nation's commitment to self-government and the rights protected by the First Amendment. See, *e.g., Brown* v. *Hartlage*, 456 U. S. 45, 52 (1982) ("At the core of the First Amendment are certain basic conceptions about the manner in which political discussion in a representative democracy should proceed"); *Buckley* v. *Valeo*, 424 U. S. 1, 93, n. 127 (1976) *(per curiam)* ("[T]he central purpose of the Speech and Press Clauses was to assure a society in which 'uninhibited, robust, and wide-open' public debate concerning matters of public interest would thrive, for only in such a society can a healthy representative democracy flourish"); *Cox* v. *Louisiana*, 379 U. S. 536, 552 (1965) ("Maintenance of the opportunity for free political discussion is a basic tenet of our constitutional democracy"); *Whitney* v. *California*, 274 U. S. 357, 375 (1927) (Brandeis, J., concurring); *Patterson* v. *Colorado ex rel. Attorney General of Colo.*, 205 U. S. 454, 465 (1907) (Harlan, J., dissenting).

The First Amendment creates "an open marketplace" in which differing ideas about political, economic, and social issues can compete freely for public acceptance without improper government interference. *New York State Bd. of Elections* v. *Lopez Torres*, 552 U. S. 196, 208 (2008). See also *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46, 51 (1988); *Mills* v. *Alabama*, 384 U. S. 214, 218–219 (1966). The government may not prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of

ideas that it approves. See *R. A. V.* v. *St. Paul*, 505 U. S. 377, 382 (1992); *Brandenburg* v. *Ohio*, 395 U. S. 444, 447–448 (1969) *(per curiam); West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943); *Wooley* v. *Maynard*, 430 U. S. 705, 713–715 (1977); *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781, 797 (1988) (The First Amendment protects "the decision of both what to say and what not to say" (emphasis deleted)). And the ability of like-minded individuals to associate for the purpose of expressing commonly held views may not be curtailed. See *Roberts* v. *United States Jaycees*, 468 U. S. 609, 623 (1984) ("Freedom of association . . . plainly presupposes a freedom not to associate"); *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 460–461 (1958).

Closely related to compelled speech and compelled association is compelled funding of the speech of other private speakers or groups. See *Abood,* 431 U. S., at 222–223. In *United States* v. *United Foods, Inc.*, 533 U. S. 405 (2001), we considered the constitutionality of a state scheme that compelled such funding. The subject of the speech at issue—promoting the sale of mushrooms—was not one that is likely to stir the passions of many, but the mundane commercial nature of that speech only highlights the importance of our analysis and our holding.

The federal Mushroom Promotion, Research, and Consumer Information Act required that fresh mushroom handlers pay assessments used primarily to fund advertisements promoting mushroom sales. A large producer objected to subsidizing these generic ads, and even though we applied the less demanding standard used in prior cases to judge laws affecting commercial speech, we held that the challenged scheme violated the First Amendment. We made it clear that compulsory subsidies for private speech are subject to exacting First Amendment scrutiny and cannot be sustained unless two criteria are met. First, there must be a comprehensive regulatory scheme

involving a "mandated association" among those who are required to pay the subsidy. *Id.,* at 414. Such situations are exceedingly rare because, as we have stated elsewhere, mandatory associations are permissible only when they serve a "compelling state interes[t] . . . that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, *supra,* at 623. Second, even in the rare case where a mandatory association can be justified, compulsory fees can be levied only insofar as they are a "necessary incident" of the "larger regulatory purpose which justified the required association." *United Foods*, *supra,* at 414.

B

When a State establishes an "agency shop" that exacts compulsory union fees as a condition of public employment, "[t]he dissenting employee is forced to support financially an organization with whose principles and demands he may disagree." *Ellis*, 466 U. S., at 455. Because a public-sector union takes many positions during collective bargaining that have powerful political and civic consequences, see Tr. of Oral Arg. 48–49, the compulsory fees constitute a form of compelled speech and association that imposes a "significant impingement on First Amendment rights." *Ellis*, *supra*, at 455. Our cases to date have tolerated this "impingement," and we do not revisit today whether the Court's former cases have given adequate recognition to the critical First Amendment rights at stake.

"The primary purpose" of permitting unions to collect fees from nonmembers, we have said, is "to prevent nonmembers from free-riding on the union's efforts, sharing the employment benefits obtained by the union's collective bargaining without sharing the costs incurred." *Davenport,* 551 U. S., at 181. Such free-rider arguments, however, are generally insufficient to overcome First Amend-

ment objections. Consider the following examples:

> "If a community association engages in a clean-up campaign or opposes encroachments by industrial development, no one suggests that all residents or property owners who benefit be required to contribute. If a parent-teacher association raises money for the school library, assessments are not levied on all parents. If an association of university professors has as a major function bringing pressure on universities to observe standards of tenure and academic freedom, most professors would consider it an outrage to be required to join. If a medical association lobbies against regulation of fees, not all doctors who share in the benefits share in the costs."[2]

Acceptance of the free-rider argument as a justification for compelling nonmembers to pay a portion of union dues represents something of an anomaly—one that we have found to be justified by the interest in furthering "labor peace." *Hudson*, 475 U. S., at 303. But it is an anomaly nevertheless.

Similarly, requiring objecting nonmembers to opt out of paying the nonchargeable portion of union dues—as opposed to exempting them from making such payments unless they opt in—represents a remarkable boon for unions. Courts "do not presume acquiescence in the loss of fundamental rights." *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.,* 527 U. S. 666, 682 (1999) (internal quotation marks omitted). Once it is recognized, as our cases have, that a nonmember cannot be forced to fund a union's political or ideological activities, what is the justification for putting the burden on the nonmember to opt out of making such a payment?

--------

[2] Summers, Book Review, Sheldon Leader, Freedom of Association: A Study in Labor Law and Political Theory, 16 Comparative Labor L. J. 262, 268 (1995).

Shouldn't the default rule comport with the probable preferences of most nonmembers? And isn't it likely that most employees who choose not to join the union that represents their bargaining unit prefer not to pay the full amount of union dues? An opt-out system creates a risk that the fees paid by nonmembers will be used to further political and ideological ends with which they do not agree. But a "[u]nion should not be permitted to exact a service fee from nonmembers without first establishing a procedure which will avoid the risk that their funds will be used, even temporarily, to finance ideological activities unrelated to collective bargaining." *Hudson*, *supra,* at 305 (internal quotation marks omitted).

Although the difference between opt-out and opt-in schemes is important, our prior cases have given surprisingly little attention to this distinction. Indeed, acceptance of the opt-out approach appears to have come about more as a historical accident than through the careful application of First Amendment principles.

The trail begins with dicta in *Street*, where we considered whether a federal collective-bargaining statute authorized a union to impose compulsory fees for political activities. 367 U. S., at 774. The plaintiffs were employees who had affirmatively objected to the way their fees were being used, and so we took that feature of the case for granted. We held that the statute did not authorize the use of the objecting employees' fees for ideological purposes, and we stated in passing that "dissent is not to be presumed—it must affirmatively be made known to the union by the dissenting employee." *Ibid.* In making that offhand remark, we did not pause to consider the broader constitutional implications of an affirmative opt-out requirement. Nor did we explore the extent of First Amendment protection for employees who might not qualify as active "dissenters" but who would nonetheless prefer to keep their own money rather than subsidizing by de-

fault the political agenda of a state-favored union.

In later cases such as *Abood* and *Hudson,* we assumed without any focused analysis that the dicta from *Street* had authorized the opt-out requirement as a constitutional matter. Thus in *Hudson* we did not take issue with the union's practice of giving employees annual notice and an opportunity to object to expected political expenditures. At the same time, however, we made it clear that the procedures used by a union to collect money from non-members must satisfy a high standard.

Contrary to the view of the Ninth Circuit panel majority, we did not call for a balancing of the "right" of the union to collect an agency fee against the First Amendment rights of nonmembers. 628 F. 3d, at 1119–1120. As we noted in *Davenport*, "unions have no constitutional entitlement to the fees of nonmember-employees." 551 U. S., at 185. A union's "collection of fees from nonmembers is authorized by an act of legislative grace," 628 F. 3d, at 1126 (Wallace, J., dissenting)—one that we have termed "unusual" and "extraordinary," *Davenport, supra*, at 184, 187. Far from calling for a balancing of rights or interests, *Hudson* made it clear that any procedure for exacting fees from unwilling contributors must be "carefully tailored to minimize the infringement" of free speech rights. 475 U. S., at 303. And to underscore the meaning of this careful tailoring, we followed that statement with a citation to cases holding that measures burdening the freedom of speech or association must serve a "compelling interest" and must not be significantly broader than necessary to serve that interest.[3]

---

[3] The specific citation was as follows:

"See *Roberts* v. *United States Jaycees,* [468 U. S. 609, 623 (1984)] (Infringements on freedom of association 'may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms'); *Elrod* v. *Burns*, 427

## IV

By authorizing a union to collect fees from nonmembers and permitting the use of an opt-out system for the collection of fees levied to cover nonchargeable expenses, our prior decisions approach, if they do not cross, the limit of what the First Amendment can tolerate. The SEIU, however, asks us to go farther. It asks us to approve a procedure under which (a) a special assessment billed for use in electoral campaigns was assessed without providing a new opportunity for nonmembers to decide whether they wished to contribute to this effort and (b) nonmembers who previously opted out were nevertheless required to pay more than half of the special assessment even though the union had said that the purpose of the fund was to mount a political campaign and that it would not be used for ordinary union expenses. This aggressive use of power by the SEIU to collect fees from nonmembers is indefensible.

### A

First, we see no justification for the union's failure to provide a fresh *Hudson* notice. *Hudson* rests on the principle that nonmembers should not be required to fund a union's political and ideological projects unless they choose to do so after having "a fair opportunity" to assess the impact of paying for nonchargeable union activities. 475 U. S., at 303. Giving employees only one opportunity per year to make this choice is tolerable if employees are able at the time in question to make an informed choice. But

_____

U. S. 347, 363 (1976) (government means must be 'least restrictive of freedom of belief and association'); *Kusper* v. *Pontikes,* 414 U. S. 51, 58–59 (1973) ('[E]ven when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty'); *NAACP* v. *Button,* 371 U. S. 415, 438 (1963) ('Precision of regulation must be the touchstone' in the First Amendment context)." *Hudson,* 475 U. S., at 303, n. 11.

a nonmember cannot make an informed choice about a special assessment or dues increase that is unknown when the annual notice is sent. When a union levies a special assessment or raises dues as a result of unexpected developments, the factors influencing a nonmember's choice may change. In particular, a nonmember may take special exception to the uses for which the additional funds are sought.[4]

The present case provides a striking example. The special assessment in this case was billed for use in a broad electoral campaign designed to defeat two important and controversial ballot initiatives and to elect sympathetic candidates in the 2006 gubernatorial and legislative elections. There were undoubtedly nonmembers who, for one reason or another, chose not to opt out or neglected to do so when the standard *Hudson* notice was sent but who took strong exception to the SEIU's political objectives and did not want to subsidize those efforts. These nonmembers might have favored one or both of the ballot initiatives; they might have wished to support the reelection of the incumbent Governor; or they might not have wanted to delegate to the union the authority to decide which candidates in the 2006 elections would receive a share of their money.

The effect on nonmembers was particularly striking with respect to the union's campaign against Proposition 75 because that initiative would have bolstered nonmember rights. If Proposition 75 had passed, nonmembers would have been exempt from paying for the SEIU's extensive political projects unless they affirmatively con-

————————

[4] The dissent suggests that the union gave fair notice because it announced at the beginning of the year that "'[d]ues are subject to change without further notice to fee payers.'" *Post,* at 12 (opinion of BREYER, J.). But a union cannot define the scope of its own notice obligations simply by promulgating a clause giving itself the power to increase fees at any time for any purpose without further notice.

sented. Thus, the effect of the SEIU's procedure was to force many nonmembers to subsidize a political effort designed to restrict their own rights.

As *Hudson* held, procedures for collecting fees from nonmembers must be carefully tailored to minimize impingement on First Amendment rights, and the procedure used in this case cannot possibly be considered to have met that standard. After the dues increase was adopted, the SEIU wrote to all employees in the relevant bargaining units to inform them of this development. It would have been a relatively simple matter for the union to cast this letter in the form of a new *Hudson* notice, so that nonmembers could decide whether they wanted to pay for the union's electoral project.

The SEIU argues that we should not be troubled by its failure to provide a new notice because nonmembers who objected to the special assessment but were nonetheless required to pay it would have been given the chance to recover the funds in question by opting out when the next annual notice was sent. If the special assessment was used entirely or in part for nonchargeable purposes, they suggest, the percentage of the union's annual expenditures for chargeable purposes would decrease, and therefore the amount of the dues payable by objecting nonmembers the following year would also decrease. This decrease, however, would not fully recompense nonmembers who did not opt out after receiving the regular notice but would have opted out if they had been permitted to do so when the special assessment was announced.[5] And in any event, even a full refund would not undo the violation of First Amendment rights. As we have recognized, the First

_____

[5]These nonmembers, after paying the full amount of the special assessment, would be required during the subsequent year to pay at least as much as those nonmembers who did opt out when they received the initial *Hudson* notice.

Amendment does not permit a union to extract a loan from unwilling nonmembers even if the money is later paid back in full. See *Hudson, supra,* at 305; *Ellis*, 466 U. S., at 444. Here, for nonmembers who disagreed with the SEIU's electoral objectives, a refund provided after the union's objectives had already been achieved would be cold comfort.[6]

To respect the limits of the First Amendment, the union should have sent out a new notice allowing nonmembers to opt in to the special fee rather than requiring them to opt out. Our cases have tolerated a substantial impingement on First Amendment rights by allowing unions to impose an opt-out requirement at all. Even if this burden can be justified during the collection of regular dues on an annual basis, there is no way to justify the additional burden of imposing yet another opt-out requirement to collect special fees whenever the union desires.

### B

#### 1

The SEIU's treatment of nonmembers who opted out

---

[6] JUSTICE SOTOMAYOR contends that a new *Hudson* notice should be required only when a special assessment is imposed for political purposes. *Post,* at 2 (opinion concurring in judgment). But as even the dissent acknowledges, *post,* at 7, such a rule would be unworkable. First, our cases have recognized that a union's money is fungible, so even if the new fee were spent entirely for nonpolitical activities, it would free up other funds to be spent for political purposes. See *Retail Clerks* v. *Schermerhorn*, 373 U. S. 746, 753 (1963) (noting that particular fee earmarks are "of bookkeeping significance only rather than a matter of real substance"). And second, unless we can rely on unions to advertise the true purpose behind every special fee, it is not clear how a court could make a timely determination of whether each new fee is political in nature. It would be practically impossible to require the parties to litigate the purpose of every fee merely to determine whether notice is required.

when the initial *Hudson* notice was sent also ran afoul of the First Amendment. The SEIU required these employees to pay 56.35% of the special assessment, just as they had been required to pay 56.35% of the regular annual dues. But the union proclaimed that the special assessment would be used to support an electoral campaign and would not be used for ordinary union expenses. Accordingly, there is no reason to suppose that 56.35% of the new assessment was used for properly chargeable expenses. On the contrary, if the union is to be taken at its word, virtually all of the money was slated for nonchargeable uses.

The procedure accepted in *Hudson* is designed for use when a union sends out its regular annual dues notices. The procedure is predicated on the assumption that a union's allocation of funds for chargeable and nonchargeable purposes is not likely to vary greatly from one year to the next.[7] No such assumption is reasonable, however, when a union levies a special assessment or raises dues as a result of events that were not anticipated or disclosed at the time when a yearly *Hudson* notice was sent. Accordingly, use of figures based on an audit of the union's operations during an entire previous year makes no sense.

Nor would it be feasible to devise a new breakdown of chargeable and nonchargeable expenses for the special assessment. Determining that breakdown is problematic enough when it is done on a regular annual basis because auditors typically do not make a legal determination as to whether particular expenditures are chargeable. Instead,

_____

[7] The SEIU contends that "[s]ignificant fluctuations in the chargeable and nonchargeable proportions of a union's spending are inevitable," Brief for Respondent 13, and the dissent appears to agree, *post,* at 10. But if the *Hudson* Court had proceeded on this assumption it is doubtful that it would have found it acceptable for a union to rely solely on the breakdown in the most recent year rather than computing the average breakdown over a longer period.

the auditors take the union's characterization for granted and perform the simple accounting function of "ensur[ing] that the expenditures which the union claims it made for certain expenses were actually made for those expenses." *Andrews* v. *Education Assn. of Cheshire,* 829 F. 2d 335, 340 (CA2 1987). Thus, if a union takes a very broad view of what is chargeable—if, for example, it believes that supporting sympathetic political candidates is chargeable and bases its classification on that view—the auditors will classify these political expenditures as chargeable. Objecting employees may then contest the union's chargeability determinations, but the onus is on the employees to come up with the resources to mount the legal challenge in a timely fashion.[8] See, *e.g., Lehnert*, 500 U. S., at 513; *Jibson* v. *Michigan Ed. Assn.*, 30 F. 3d 723, 730 (CA6 1994). This is already a significant burden for employees to bear simply to avoid having their money taken to subsidize speech with which they disagree, and the burden would become insupportable if unions could impose a new assessment at any time, with a new chargeability determination to be challenged.

2

The SEIU argues that objecting nonmembers who were required to pay 56.35% of the special assessment, far from subsidizing the union's political campaign, actually received a windfall. According to the union's statistics, the actual percentage of regular dues and fees spent for chargeable purposes in 2005 turned out to be quite a bit higher (66.26%), and therefore, even if all of the money obtained through the special assessment is classified as nonchargeable, the union's total expenditures for 2005

———————

[8] The dissent is comforted by the fact that the union "has offered to pay for neutral arbitration of such disputes before the American Arbitration Association," *post,* at 9, but the painful burden of initiating and participating in such disputes cannot be so easily relieved.

were at least 66.26% chargeable. See Brief for Respondent 5, n. 6. This argument is unpersuasive for several reasons.

First, the SEIU's understanding of the breadth of chargeable expenses is so expansive that it is hard to place much reliance on its statistics. In its brief, the SEIU argues broadly that all funds spent on "lobbying . . . the electorate" are chargeable. See *id.*, at 51. But "lobbying . . . the electorate" is nothing but another term for supporting political causes and candidates, and we have never held that the First Amendment permits a union to compel nonmembers to support such political activities. On the contrary, as long ago as *Street*, we noted the important difference between a union's authority to engage in collective bargaining and related activities on behalf of nonmember employees in a bargaining unit and the union's use of nonmembers' money "to support candidates for public office" or "to support political causes which [they] oppos[e]." 367 U. S., at 768.

The sweep of the SEIU's argument is highlighted by its discussion of the use of fees paid by objecting nonmembers to defeat Proposition 76. According to the SEIU, these expenditures were "germane" to the implementation of its contracts because, if Proposition 76 had passed, it would have "effectively permitted the Governor to abrogate the Union's collective bargaining agreements under certain circumstances, undermining the Union's ability to perform its representation duty of negotiating effective collective bargaining agreements." Brief for Respondent 49–50 (internal quotation marks omitted).

If we were to accept this broad definition of germaneness, it would effectively eviscerate the limitation on the use of compulsory fees to support unions' controversial political activities. Public-employee salaries, pensions, and other benefits constitute a substantial percentage of the budgets of many States and their subdivisions. As a

result, a broad array of ballot questions and campaigns for public office may be said to have an effect on present and future contracts between public-sector workers and their employers. If the concept of "germaneness" were as broad as the SEIU advocates, public-sector employees who do not endorse the unions' goals would be essentially unprotected against being compelled to subsidize political and ideological activities to which they object.

Second, even if the SEIU's statistics are accurate, it does not follow that it was proper for the union to charge objecting nonmembers 56.35%—or any other particular percentage—of the special assessment. Unless it is possible to determine in advance with some degree of accuracy the percentage of union funds that will be used during an upcoming year for chargeable purposes—and the SEIU argues that this is not possible—there is at least a risk that, at the end of the year, unconsenting nonmembers will have paid either too much or too little. Which side should bear this risk?

The answer is obvious: the side whose constitutional rights are not at stake. "Given the existence of acceptable alternatives, [a] union cannot be allowed to commit dissenters' funds to improper uses even temporarily." *Ellis*, 466 U. S., at 444. Thus, if unconsenting nonmembers pay too much, their First Amendment rights are infringed. On the other hand, if unconsenting nonmembers pay less than their proportionate share, no constitutional right of the union is violated because the union has no constitutional right to receive any payment from these employees. See *Davenport*, 551 U. S., at 185. The union has simply lost for a few months the "extraordinary" benefit of being empowered to compel nonmembers to pay for services that they may not want and in any event have not agreed to fund.

As we have noted, by allowing unions to collect any fees from nonmembers and by permitting unions to use opt-out

rather than opt-in schemes when annual dues are billed, our cases have substantially impinged upon the First Amendment rights of nonmembers. In the new situation presented here, we see no justification for any further impingement. The general rule—individuals should not be compelled to subsidize private groups or private speech— should prevail.

Public-sector unions have the right under the First Amendment to express their views on political and social issues without government interference. See, *e.g., Citizens United* v. *Federal Election Comm'n,* 558 U. S. ___ (2010). But employees who choose not to join a union have the same rights. The First Amendment creates a forum in which all may seek, without hindrance or aid from the State, to move public opinion and achieve their political goals. "First Amendment values [would be] at serious risk if the government [could] compel a particular citizen, or a discrete group of citizens, to pay special subsidies for speech on the side that [the government] favors." *United Foods*, 533 U. S., at 411. Therefore, when a public-sector union imposes a special assessment or dues increase, the union must provide a fresh *Hudson* notice and may not exact any funds from nonmembers without their affirmative consent.[9]

––––––––––

[9] Contrary to JUSTICE SOTOMAYOR's suggestion, our holding does not venture beyond the scope of the questions on which we granted review or the scope of the parties' dispute. The second question on which we granted review broadly asks us to determine the circumstances under which a State may deduct from the pay of nonunion employees money that is used by a union for general electioneering. See Pet. for Cert. (i) ("May a State, consistent with the First and Fourteenth Amendments, condition continued public employment on the payment of union agency fees for purposes of financing political expenditures for ballot measures?"). Our holding—that this may be done only when the employee affirmatively consents—falls within that question.

Our holding also addresses the primary remaining dispute between the parties, namely, the particular procedures that must be followed on

\*    \*    \*

The judgment of the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

———

remand in order to provide adequate assurance that members of the class are not compelled to subsidize nonchargeable activities to which they object. See *supra,* at 7–8. Petitioners argue strenuously that these procedures must be narrowly tailored to minimize intrusion on their free-speech rights. See Brief for Petitioners 11–17. We see no sensible way to address this dispute without confronting the question whether, in the particular context present here, an opt-out regime suffices.

JUSTICE SOTOMAYOR would apparently have us proceed on the *assumption* that an opt-out regime is permitted. She would then have us decide what sort of opt-out procedures would be sufficient if such a regime were allowed at all. But that is a question that simply cannot be answered. It would be like asking what sort of procedural requirements would be required if the government set out to do something else that the First Amendment flatly prohibits—for example, requiring prepublication approval of newspapers.

There is also no merit in JUSTICE SOTOMAYOR's and JUSTICE BREYER's comments about prior precedent. This case concerns the procedures that must be followed when a public-sector union announces a special assessment or mid-year dues increase. No prior decision of this Court has addressed that question, and *Hudson* says not one word on the subject.

# SUPREME COURT OF THE UNITED STATES

———————

No. 10–1121

———————

## DIANNE KNOX, ET AL., PETITIONERS *v.* SERVICE EM-PLOYEES INTERNATIONAL UNION, LOCAL 1000

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 21, 2012]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG joins, concurring in the judgment.

When a public-sector union imposes a special assessment intended to fund solely political lobbying efforts, the First Amendment requires that the union provide nonmembers an opportunity to opt out of the contribution of funds. I therefore concur in the Court's judgment.

I concur only in the judgment, however, because I cannot agree with the majority's decision to address unnecessarily significant constitutional issues well outside the scope of the questions presented and briefing. By doing so, the majority breaks our own rules and, more importantly, disregards principles of judicial restraint that define the Court's proper role in our system of separated powers.

I

The Political Fight-Back Fund was to be used by Service Employees International Union, Local 1000 (SEIU), "specifically in the political arenas of California" to defeat perceived antiunion initiatives and to elect a sympathetic Governor and legislature. App. 25; see also *id.*, at 31. As the majority explains, such political efforts are not "germane" to the union's function as a bargaining representative, and accordingly are not chargeable to objecting nonmembers. See *Lehnert* v. *Ferris Faculty Assn.*, 500 U. S.

507, 519 (1991); see also *Locke* v. *Karass*, 555 U. S. 207, 211 (2009) ("[N]onchargeable union activities [include] political, public relations, or lobbying activities"). While the union is free to pursue its ideological goals in the political arena, it may not subsidize its efforts with objecting nonmembers' funds, lest the objector be used as "'an instrument for fostering public adherence to an ideological point of view he finds unacceptable.'" *Lehnert*, 500 U. S., at 522 (plurality opinion) (quoting *Wooley* v. *Maynard*, 430 U. S. 705, 715 (1977)).

Accordingly, when a union levies a special assessment or dues increase to fund political activities, the union may not collect funds from nonmembers who earlier had objected to the payment of nonchargeable expenses, and may not collect funds from other nonmembers without providing a new *Hudson* notice and opportunity to opt out. See *Teachers* v. *Hudson*, 475 U. S. 292 (1986). Because SEIU failed to follow these procedures, it did not satisfy its constitutional obligations. That holding should end this case; it is all petitioners asked this Court to decide.[1]

## II

The majority agrees that SEIU's actions were at odds with the First Amendment. Yet it proceeds, quite unnecessarily, to reach significant constitutional issues not contained in the questions presented, briefed, or argued. Petitioners did not question the validity of our precedents, which consistently have recognized that an opt-out system

---

[1] See Pet. for Cert. (i) (questions presented); Brief for Petitioners (i) (same); *id.*, at 39 ("The Court should hold that . . . when a union imposes a forced-fee increase primarily or solely for political purposes between notices, it may not collect the increase from nonmembers who have already objected, and it must not collect the increase from other nonmembers until it has ascertained their wishes by providing them with a new notice about the increase's purpose and an opportunity to opt out"); see also App. 18–19 (complaint).

of fee collection comports with the Constitution. See *Davenport* v. *Washington Ed. Assn.*, 551 U. S. 177, 181, 185 (2007); *Hudson*, 475 U. S., at 306, n. 16; *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209, 238 (1977); see also *ante,* at 12–13. They did not argue that the Constitution requires an opt-in system of fee collection in the context of special assessments or dues increases or, indeed, in any context. Not surprisingly, respondents did not address such a prospect.

Under this Court's Rule 14.1(a), "[o]nly the questions set out in the petition, or fairly included therein, will be considered by the Court." "[W]e disregard [that rule] 'only in the most exceptional cases,' where reasons of urgency or economy suggest the need to address the unpresented question in the case under consideration." *Yee* v. *Escondido*, 503 U. S. 519, 535 (1992) (quoting *Stone* v. *Powell*, 428 U. S. 465, 481, n. 15 (1976)). The majority does not claim any such exceptional circumstance here. Yet it reaches out to hold that "when a public-sector union imposes a special assessment or dues increase, the union must provide a fresh *Hudson* notice and *may not exact any funds from nonmembers without their affirmative consent.*" *Ante,* at 22 (emphasis added); see also *ante*, at 17 ("[T]he union should have sent out a new notice allowing nonmembers to opt in to the special fee rather than requiring them to opt out"). The majority thus decides, for the very first time, that the First Amendment *does* require an opt-in system in some circumstances: the levying of a special assessment or dues increase. The majority announces its novel rule without any analysis of potential countervailing arguments and without any reflection on the reliance interests our old rules have engendered.

The majority's choice to reach an issue not presented by the parties, briefed, or argued, disregards our rules. See *Yee*, 503 U. S., at 535. And it ignores a fundamental premise of our adversarial system: "'that appellate courts

do not sit as self-directed boards of legal inquiry and
research, but essentially as arbiters of legal questions pre-
sented and argued by the parties before them.'"    *NASA*
v. *Nelson*, 562 U. S. ___, ___, n. 10 (2011) (opinion for the
Court by ALITO, J.) (slip op., at 11, n. 10) (quoting *Car-
ducci* v. *Regan*, 714 F. 2d 171, 177 (CADC 1983) (opinion for
the court by Scalia, J.)); see also *Jefferson* v. *Upton*, 560
U. S. ___, ___ (SCALIA, J., joined by THOMAS, J., dissenting)
(slip op., at 8) (The majority's "refusal to abide by standard
rules of appellate practice is unfair to the . . . Circuit,"
which did not pass on this question, "and especially to the
respondent here, who suffers a loss in this Court without
*ever* having an opportunity to address the merits of the . . .
question the Court decides").   The imperative of judicial
restraint is at its zenith here, with respect to an issue of
such constitutional magnitude, for "[i]f there is one doc-
trine more deeply rooted than any other in the process of
constitutional adjudication, it is that we ought not to pass
on questions of constitutionality . . . unless such adjudica-
tion is unavoidable."  *Clinton* v. *Jones*, 520 U. S. 681, 690,
n. 11 (1997) (internal quotation marks omitted).[2]

———————

[2] The majority contends that its holding "does not venture beyond
the scope of the questions on which we granted review," pointing to the
second question presented.  *Ante,* at 22, n. 9.  The majority is mistaken.
That question concerns the chargeability of political and lobbying
activities under *Lehnert* v. *Ferris Faculty Assn.*, 500 U. S. 507, 522
(1991), not the procedures by which a union may collect fees.   See
Pet. for Cert. (i); *id.,* at 20–27 (describing scope of second question pre-
sented); *id.*, at 23 ("There is a serious split, and confusion, among the
circuits on the chargeability of union political and lobbying activities").
Indeed, it is only petitioners' first question presented that deals with
fee-collection procedures.   And in that question, petitioners ask this
Court to hold that SEIU may not collect its special assessment without
providing a *Hudson* notice that offers "an opportunity *to object to*" the
deduction of fees for the assessment.  *Id.*, at (i) (emphasis added).

The phrase "opt in" appears not once in petitioners' briefing. The
majority protests that it cannot but hold that an opt-in regime is
required, seeing as the opt-out regime the petitioners advocate is, in the

   To make matters worse, the majority's answer to its unasked constitutional question is not even clear. After today, must a union undertaking a special assessment or dues increase obtain affirmative consent to collect "*any funds*" or solely to collect funds for *nonchargeable* expenses? May a nonmember opt not to contribute to a special assessment, even if the assessment is levied to fund uncontestably chargeable activities? Does the majority's new rule allow for any distinction between nonmembers who had earlier objected to the payment of nonchargeable expenses and those who had not? What procedures govern this new world of fee collection?

   Moreover, while the majority's novel rule is, on its face, limited to special assessments and dues increases, the majority strongly hints that this line may not long endure. The majority pronounces the Court's explicit holding in *Machinists* v. *Street*, 367 U. S. 740, 774 (1961)—that "dissent is not to be presumed[,] it must affirmatively be made known to the union by the dissenting employee"— nothing but an "offhand remark," made by Justices who did not "pause to consider the broader constitutional implications of an affirmative opt-out requirement," *ante*, at 12. The reader is told that our precedents' "acceptance of the opt-out approach appears to have come about more as a historical accident than through the careful application of First Amendment principles." *Ibid.* And that "[b]y authorizing a union to collect fees from nonmembers and permitting the use of an opt-out system for the collection

--------

majority's view, unconstitutional. But if the Court was dissatisfied with the scope of the questions presented here it should not have granted certiorari in this case. Or having granted it, the Court should have asked for supplemental briefing on the question whether an opt-in regime is constitutionally required. What it should not have done— *cannot do* under our rules—is decide that question without having provided the parties and potential *amici* an opportunity to weigh in with their own considered views.

of fees levied to cover nonchargeable expenses, our prior decisions *approach, if they do not cross,* the limit of what the First Amendment can tolerate." *Ante*, at 14 (emphasis added); see also *ante*, at 21–22 ("[B]y allowing unions to collect any fees from nonmembers and by permitting unions to use opt-out rather than opt-in schemes when annual dues are billed, our cases have substantially impinged upon the First Amendment rights of nonmembers"); *ante*, at 11–12 ("Once it is recognized . . . that a nonmember cannot be forced to fund a union's political or ideological activities, what is the justification for putting the burden on the nonmember to opt out of making such a payment?  Shouldn't the default rule comport with the probable preferences of most nonmembers?").

To cast serious doubt on longstanding precedent is a step we historically take only with the greatest caution and reticence.  To do so, as the majority does, on our own invitation and without adversarial presentation is both unfair and unwise.  It deprives the parties and potential *amici* of the opportunity to brief and argue the question. It deprives us of the benefit of argument that the parties, with concrete interests in the question, are surely better positioned than we to set forth.  See *NASA*, 562 U. S., at ___, n. 10 (opinion for the Court by ALITO, J.) (slip op., at 11, n. 10) ("It is undesirable for us to decide a matter of this importance in a case in which we do not have the benefit of briefing by the parties and in which potential *amici* had little notice that the matter might be decided"). Not content with our task, prescribed by Article III, of answering constitutional questions, the majority today decides to ask them as well.

# SUPREME COURT OF THE UNITED STATES

———————

No. 10–1121

———————

## DIANNE KNOX, ET AL., PETITIONERS *v.* SERVICE EM-PLOYEES INTERNATIONAL UNION, LOCAL 1000

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 21, 2012]

JUSTICE BREYER, with whom JUSTICE KAGAN joins, dissenting.

In *Teachers* v. *Hudson,* 475 U. S. 292 (1986), this Court unanimously held that "the Union cannot be faulted for calculating its fee on the basis of its expenses during the preceding year." *Id.,* at 307, n. 18. That is precisely what the union has done in this case. I see no reason to modify *Hudson'*s holding as here applied. I consequently dissent.

I

In *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977), the Court held that nonunion public employees have a First Amendment right to prevent a union's spending a part of their compulsory fees on contributions to political candidates or on "express[ions of] political views unrelated to [the union's] duties as exclusive bargaining representative." *Id.,* at 234. A decade later in *Hudson*, the Court considered the constitutionality of procedures adopted to implement *Abood*. In particular, the Court considered the procedures adopted by a teachers union "to draw that necessary line and to respond to nonmembers' objections to the manner in which it was drawn." 475 U. S*.,* at 294.

The teachers union had calculated the fee it could charge nonmembers during a particular year on the basis of the expenditures the union actually made during the

prior year. Those nonmembers who objected to the apportionment, believing their fee too high, could lodge an objection with the union, proceed through arbitration, and receive a rebate if they won. The Court found this procedure constitutionally inadequate. It thought that (1) a rebate "does not avoid the risk that dissenters' funds may be used temporarily for an improper purpose," (2) the union had not provided the nonmembers in advance with "sufficient information to gauge the propriety of the union's fee," and (3) the union did not provide objectors with "a reasonably prompt decision by an impartial decisionmaker." *Id.,* at 305–307.

The Court then held that the Constitution requires that a union collecting a fee from nonmembers provide "an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." *Id.,* at 310.

The Court added that it "recognize[d] that there are practical reasons why '[a]bsolute precision' in the calculation of the charge to nonmembers cannot be 'expected or required.'" *Id.,* at 307, n. 18 (quoting *Railway Clerks* v. *Allen,* 373 U. S. 113, 122 (1963)). It said that the union retains the burden of proving that a given expense is chargeable to nonmembers, the "nonmember's 'burden'" being simply that of making "his objection known." 475 U. S., at 306, n. 16. And it added that the union "cannot be faulted for calculating its fee on the basis of its expenses during the preceding year." *Id.,* at 307, n. 18.

For the last 25 years unions and employers across the Nation have relied upon this Court's statements in *Hudson* in developing administratively workable systems that (1) allow unions to pay the costs of fulfilling their representational obligations to both members and nonmembers alike, while (2) simultaneously protecting the

nonmembers' constitutional right not to support "'ideological causes not germane to [the union's] duties as collective-bargaining agent.'" *Id.,* at 294 (quoting *Ellis* v. *Railway Clerks*, 466 U. S. 435, 447 (1984)). See also *Keller* v. *State Bar of Cal.*, 496 U. S. 1, 17 (1990) (explaining that *Hudson* "outlined a minimum set of procedures by which a union in an agency-shop relationship could meet its requirement under *Abood*"). The Court, in my view, should not depart, or create an exception, from *Hudson*'s framework here.

## II

Because the administrative details of the fee collection process are critical, I shall begin by explaining how I understand that process to work. The union here followed a basic administrative system that ensures that the fee charged to objecting nonmembers matches their pro rata share of the union's chargeable expenditures, but it achieves that match only over a period of several years. At the end of 2004, independent auditors determined the amount of chargeable (*e.g.,* collective-bargaining related) expenditures and the amount of nonchargeable (*e.g.,* non-germane political) expenditures that the union actually made during 2004. The union then used the resulting proportion (which was about 56% chargeable, 44% non-chargeable) as the basis for apportioning the next year's dues. Thus in June 2005, the union sent all represented employees a *Hudson* notice setting forth that (roughly) 56 to 44 figure. App. 96–106. It provided time for nonmembers to object or to challenge the figure or underlying data. *Id.,* at 98–104. And it then applied the resulting figure to determine the percentage of the total fee that objecting nonmembers would have to pay during the next fee-year, which ran from July 2005 to June 2006. *Id.,* at 102. At the end of 2005, auditors again examined the union's actual expenditures made during 2005. And the union then used those newly audited figures to determine the

chargeable percentage for the fee-year 2006–2007. *Id.,* at 158. Since political expenditures during calendar year 2005 turned out to be lower than in 2004, the new chargeable share amounted to about 69% of the total fee bill. *Ibid.*

Simplifying further to illustrate, I shall describe the system as (1) using audited accounts for Year One to determine the proportion of the fee that objectors must pay during Year Two, and (2) using audited accounts for Year Two to determine the proportion of the fee that objectors must pay during Year Three. If Year One's chargeable share (as applied to Year Two) turns out to be too high, Year Two's audited accounts will reflect that fact, and the payable share for Year Three will be reduced accordingly.

This system does not put typical objectors to any disadvantage. If, say, in Year One total expenses were $1 million, collective-bargaining expenses amounted to $600,000, and political expenses amounted to $400,000, then the union cannot charge objecting nonmembers more than 60% of normal dues in Year Two. If in Year Two collective-bargaining expenses turned out to be a lesser share of total expenses, say 30%, then the union cannot charge objecting nonmembers more than 30% of the total fee in Year Three. Normally, what the objecting nonmembers lose on the swings they will gain on the roundabouts.

This kind of basic administrative system is imperfect. The nature of a union's expenditures, including nonchargeable political expenditures, varies from year to year, for political needs differ at different stages of political cycles. Thus, last year's percentages will often fail to match this year's expenditures patterns. And the possibility that an objecting nonmember's funds will temporarily help the union pay for a nonchargeable political expenditure (say, in Year Two) is always present—though in this case that did not happen. See *infra,* at 6–7.

Nonetheless this kind of system enjoys an offsetting administrative virtue. It bases fees upon audited accounts, thereby avoiding the difficulties and disagreements that would surround an effort to determine the relevant proportions by trying to measure union expenditures as they occur or by trying to make predictions about the nature of future expenditures. It consequently gives workers reliable information. It gives workers advance notice of next year's payable charge. It gives nonmembers a "reasonably prompt" opportunity to object. *Hudson*, 475 U. S., at 310. And, where the chargeable share of next year's expenses (Year Two) turns out to be lower than last year's (Year One), it provides offsetting compensation in the form of a lower payable share for the following year (Year Three).

In any event, these features are characteristic of an administrative system that "calculat[es]" shares of a union's fee "on the basis of its expenses during the preceding year." *Id.,* at 307, n. 18. *Hudson* stated specifically that the "[u]nion cannot be faulted for calculating its fee" on that basis. *Ibid.* And no party here has challenged the constitutional validity of that basic administrative system. See Tr. of Oral Arg. 13.

### III

If the union's basic administrative system does not violate the Constitution, then how could its special assessment have done so? In my view, it did not violate the Constitution, and I shall explain my basis for thinking so by considering separately (1) those nonmembers who objected initially to the 2005 *Hudson* notice, and (2) those nonmembers who did not initially object.

### A

The special assessment as administered here has worked no constitutional harm upon those nonunion em-

ployees who raised a general objection at the beginning of the year. The union has honored their objections by subtracting from their special payments the same 44% that it subtracts from each of their ordinary monthly payments. App. 309. And we know that the special assessment here did not even work temporary constitutional harm. That is because audited figures showed that the union's total nonchargeable (*e.g.,* political) expenses for that year ended up as a *lower* percentage of total expenses than the previous year. Hence the objecting nonmembers ended up being charged too little, not too much, even with the special assessment thrown into the mix.

Let me put the point more specifically. The union's June 2005 *Hudson* notice said that the union would charge objecting nonmembers roughly 56% of the dues paid by union members. See App. 102. That 56% figure represented the chargeable portion of expenditures according to the audited figures from 2004. Thus, if the fee charged to a union member pursuant to the 2005 notice was $400, the fee charged to an objecting nonmember was $224. The union similarly prorated the special assessment charging objecting nonmembers 56% of the assessment it imposed upon members. Thus, if the special assessment amounted to $50 for a member, it amounted to $28 for an objecting nonmember. And total dues in this example would have amounted to $450 for a member and $252 for a nonmember.

In the event, the union's chargeable expenses for 2005—including the funds raised pursuant to the special assessment—amounted to *more* than 56% of its total expenditures. The auditor's reports show that the union's total expenditures in 2005 amounted to $40,045,409. *Id.,* at 166. Chargeable expenses amounted to $27,552,746, which works out to 69% of the total budget. *Ibid.* Thus, a substantially larger portion of the union's 2005 spending was chargeable (69%) than it had been in 2004 (56%).

Objecting nonmembers therefore paid 56% of normal fees, even though the chargeable share that year was 69%. That is to say, they paid less than what the Constitution considers to be their fair share. See *Abood*, 431 U. S., at 236–237.

Even were the underlying facts different, I can find no constitutional basis for charging an objecting nonmember *less* than the 56% that the preceding year's audit showed was appropriate. In general, any effort to send a new notice and then apply special percentages to a special midyear assessment fee runs into administrative difficulties that, as explained above, are avoided with a retrospective system. See *supra,* at 6. And, of course, requiring the use of some special proportion based on predicted expenditures would contradict *Hudson'*s determination that prior year, not present year, expenditures can form the basis for the determination of that proportion. See *Hudson, supra,* at 307, n. 18.

In the particular example before us these general problems are camouflaged by the fact that the union itself said that the assessment was to be used for political purposes. Hence it is tempting to say that 100% of the assessment is not chargeable. But future cases are most unlikely to be so clear; disputes will arise over union predictions (say, that only 20% of the special assessment will be used for political purposes); and the Court will then perhaps understand the wisdom of *Hudson'*s holding. In any event, we have made clear in other cases that money is fungible. *Retail Clerks* v. *Schermerhorn*, 373 U. S. 746, 753 (1963). Whether a particular expenditure was funded by regular dues or the special assessment is "of bookkeeping significance only rather than a matter of real substance." *Ibid.* And, the Court's focus on the announced purposes of the special assessment, rather than yearly expenditures taken as a whole, is beside the point.

The Court's response to these problems, particularly the

administrative calculation problems, is apparently to de-
part yet further from the Court's earlier holdings.  It
seems to say that an objector can withhold 100%, not
simply of a special assessment made for political purposes,
but of *any special assessment whatsoever,* including an
assessment made solely for the purpose of paying for extra
chargeable costs, such as extended contract negotiations,
pension plan experts, or newly assessed contributions to
replenish a national union's collective-bargaining assis-
tance funds.  See *ante,* at 21–22.  Although this rule is
comparatively simple to administer, it cannot be recon-
ciled with the Court's previous constitutional holdings.
*Abood,* along with every related case the Court has ever
decided, makes clear that the Constitution *allows* a union
to assess nonmembers a pro rata share of fees insofar
as they are used to pay for these kinds of collective-
bargaining expenses.  See 431 U. S., at 234–236; see also
*Lehnert* v. *Ferris Faculty Assn.*, 500 U. S. 507, 524 (1991);
*Machinists* v. *Street*, 367 U. S. 740, 760 (1961); *Ellis*, 466
U. S., at 447; *Davenport* v. *Washington Ed. Assn.*, 551
U. S. 177, 181 (2007); *Locke* v. *Karass*, 555 U. S. 207, 210
(2009).  How could the majority now hold to the contrary?

   If there are good reasons for requiring departure from
the basic *Hudson*-approved administrative system, they
are not the reasons the Court provides.  It suggests that
the basic *Hudson* administrative system gives the union
the freedom to misclassify, arguing, for example, that the
union has adopted an overly broad definition of charge-
ability.  See *ante,* at 20–21. The 2005 proportion, however,
rested upon audited 2004 accounts.   While petitioners
argue in this Court that the union misclassified parts
of the special assessment (which was not imposed until
2005), no brief filed in this case (and certainly no court
below) has challenged the accuracy of the 2004 figures or
the resulting chargeable/nonchargeable allocation.   In-
deed, the 2004 accounts were audited before the special

assessment at the center of this case was even imposed. Compare App. 108 (reflecting that the audit of the 2004 budget was completed by April 25, 2005) with *id.*, at 25 (reflecting approval of the special assessment on July 30, 2005).

More specifically, the Court suggests that the Constitution prohibits the union's classification of money spent "'lobbying . . . the electorate'" as a chargeable expense. See *ante,* at 20. But California state law explicitly permits the union to classify some lobbying expenses as chargeable. See Cal. Govt. Code Ann. §3515.8 (West 2010) (a nonmember's fair share includes "the costs of support of lobbying activities designed to foster policy goals and collective negotiations and contract administration"); see also *Lillebo* v. *Davis*, 222 Cal. App. 3d 1421, 1442, 272 Cal. Rptr. 638, 651 (1990) (construing §3515.8 narrowly, but explaining that "[w]e cannot fathom how a union's lobbying the Legislature for improvement of the conditions of employment of the members of its bargaining unit . . . could not be considered to be part of its role as representative . . ."). No one has attacked the constitutionality of California's law; no brief argues the question; and this Court does not normally find state laws unconstitutional without, at least, giving those who favor the law an opportunity to argue the matter.

The Court further complains that the basic administrative system requires an objecting nonmember to "come up with the resources to mount" a "legal challenge" to the union's allocation "in a timely fashion." *Ante,* at 19. That concern too is misplaced. The union has offered to pay for neutral arbitration of such disputes before the American Arbitration Association. App. 103–104. And, again, insofar as the Court casts doubt on the constitutional validity of the basic system, the Court does so without the benefit of argument.

Finally, the Court argues that (Step 1) *Hudson* is "pred-

icated on the assumption that a union's allocation of funds for chargeable and nonchargeable purposes is not likely to vary greatly from one year to the next," *ante,* at 18; that (Step 2) this assumption does not apply to midyear assessments; hence (Step 3) what appears binding precedent (namely *Hudson)* does not bind the Court in its interpretation of the Constitution as applied to those assessments. *Ibid.*

I must jump this logical ship, however, at Step 1. I cannot find in *Hudson* the "assumption" of uniform expenditures that the Court says underlies it. The assumption does not appear there explicitly. And it is hard to believe any such assumption could implicitly lurk within a case involving a union's political expenditures. Those expenditures inevitably vary from political season to season. They inevitably depend upon the number and kind of union-related matters currently visible on the political agenda. Cf., *e.g.,* App. 102, 158, 223 (union's chargeability proportion varies significantly over three years, from 56.35% in 2004, to 68.8% in 2005, to 60.3% in 2006). And it is hard to believe that the Members of this Court, when deciding *Abood,* were not fully aware of these obvious facts.

## B

A stronger case can be made for allowing nonmember employees *who did not object* at the beginning of the dues year to object (for the first time) to a special assessment. That is because, unlike the nonmember who objected initially, the union will not permit that initially nonobjecting nonmember to withhold anything from the special assessment fee. Nonetheless, there are powerful reasons not to allow the nonmember who did not object initially to the annual fee to object now for the first time to the midyear special assessment.

For one thing, insofar as a new objection permits the

new objector to withhold only the portion of the fee that will pay for nonchargeable expenses (as the logic of the concurring Justices would suggest), the administrative problems that I earlier discussed apply. See *supra,* at 6. That is to say, unions, arbitrators, and courts will have to determine, on the basis of a prediction, *how much* of the special assessment the new objector can withhold. I concede that many administrative problems could be overcome were the new objector allowed to withhold only the same 44% of the fee that the union here permitted initial objectors to withhold (a figure based on 2004 audited accounts). But no Member of the Court takes that approach.

For another thing, as I have previously pointed out, the Court would permit nonmembers who did not object at the beginning of the year (like those who did then object) to object to (and to pay *none* of) *every* special assessment, including those made to raise money to pay additional *collective-bargaining expenses.* This approach may avoid the uncertainty and resulting disputes inherent in an effort to limit withholding to the nonchargeable portion of the fee. But the price of avoiding those disputes is to reduce the financial contribution the union will receive even when a special assessment pays only for unexpected but perfectly legitimate collective-bargaining expenses. See *supra,* at 8–10.

Moreover, to provide a new opportunity to object requires providing for explanations, potential challenges, the development of separate accounts, and additional administrative procedures. That means providing extra time and extra money. By definition, however, special assessments are special; time may matter; and unlike the annual dues payment, the union is unlikely to be able to provide what is here a 6-month delay (between the close of the 2004 audited year and the beginning of the next mid-2005 dues year) that can be used to examine accounts and process

objections. In a word, a new opportunity to object means time, effort, and funds set aside to deal with a new layer of administrative procedure.

I recognize that allowing objections only once a year is only one possible way to administer a fee-charging system. In principle, one might allow nonmembers to pose new objections to their dues payments biannually, or quarterly, or even once a month, as actual expenses do, or do not, correspond to initial union predictions. But for constitutional purposes the critical fact is that annual objection is at least one reasonably practical way to permit the principled objector to avoid paying for politics with which he disagrees. See *Hudson*, 475 U. S., at 307, n. 18. And that is so whether ordinary or special assessments are at stake.

Further, the nonmember who did not object initially is not likely to be a nonmember who strongly opposes the union's politics. That many unions take political positions and that they spend money seeking to advance those positions is not exactly a secret. All those whom this union represents know from history that it spends money each year for nonchargeable purposes. And any nonmember who has significant negative views about such matters is likely to have objected in advance. Those who did not object initially (but do so later) likely include many whose objection rests, not upon constitutionally protected political grounds, but simply upon a desire not to pay a higher fee. And those who withhold fees for that reason are not entitled to constitutional protection in doing so. Here, the nonobjector cannot even claim that an increase in the total fee (by the amount of the special assessment) took him by surprise, for in its initial *Hudson* notice the union said that "[d]ues are subject to change without further notice to fee payers." App. 98.

Finally, if the union will not let a nonmember object to a special assessment, that nonmember has an easy remedy. He or she can simply object the first time around. After

all, the possibility of a special assessment is known in advance; the possibility that some, or all of it, will help the union make political expenditures is known in advance; the fact that the union will spend a significant amount of ordinary dues upon political matters is known in advance. To obtain protection all a nonmember who believes he might object to some future political expenditure has to do is to object in advance. His or her fees will decline from the beginning. And, if the nonmember forgets to object, there is always next year—when the chargeable amount of the fee will be based on *this* year's actual expenditures.

Given these considerations, I do not believe the First Amendment requires giving a second objection opportunity to those nonmembers who did not object the first time.

## IV

The Court also holds that, "when a public-sector union imposes a special assessment or dues increase," it "may not exact any funds from nonmembers without their affirmative consent." *Ante,* at 22. In other words, the Court mandates an "opt-in" system in respect to the payment of special assessments.

JUSTICE SOTOMAYOR's concurring opinion explains why the Court is wrong to impose this requirement. See *ante,* at 2–6 (opinion concurring in judgment). It runs directly contrary to precedent. No party asked that we do so. The matter has not been fully argued in this Court or in the courts below. I agree with her about this matter.

The decision is particularly unfortunate given the fact that each reason the Court offers in support of its "opt-in" conclusion seems in logic to apply, not just to special assessments, but to ordinary yearly fee charges as well. At least, its opinion can be so read. And that fact virtually guarantees that the opinion will play a central role in an ongoing, intense political debate.

The debate is generally about whether, the extent to

which, and the circumstances under which a union that represents nonmembers in collective bargaining can require those nonmembers to help pay for the union's (constitutionally chargeable) collective-bargaining expenses. Twenty-three States have enacted "right to work" laws, which, in effect, prevent unions from requiring nonmembers to pay any of those costs. See Dept. of Labor, Wage and Hour Division, State Right-to-Work Laws (Jan. 2009), online at http://www.dol.gov/whd/state/righttowork.htm (as visited June 18, 2012, and available in Clerk of Court's case file). Other States have rejected the "right to work" approach and permit unions to require contributions from nonmembers, while protecting those nonmembers' right to opt out of supporting the union's political activities. *E.g.,* Cal. Govt. Code Ann. §§3502.5(a), 3515.8. Still others have enacted compromise laws that assume a nonmember does not wish to pay the nonchargeable portion of the fee unless he or she affirmatively indicates a desire to do so. See Wash. Rev. Code §42.17A.500 (2010) (providing that a union cannot use a nonmember's agency fee for political purposes "unless affirmatively authorized by the individual"). The debate about public unions' collective-bargaining rights is currently intense.

The question of how a nonmember indicates a desire not to pay constitutes an important part of this debate. Must the union assume that the nonmember does not intend to pay unless he affirmatively indicates his desire to pay, by "opting in"? Or, may the union assume that the nonmember is willing to pay unless the nonmember indicates a desire not to pay, by "opting out"? Where, as here, nonchargeable political expenses are at issue, there may be a significant number of represented nonmembers who do not feel strongly enough about the union's politics to indicate a choice either way. That being so, an "opt-in" requirement can reduce union revenues significantly, a matter of considerable importance to the union, while the additional

protection it provides primarily helps only those who are politically near neutral. See generally Sunstein & Thaler, Libertarian Paternalism is not an Oxymoron, 70 U. Chi. L. Rev. 1159, 1161 (2003) (explaining that default rules play an important role when individuals do not have "well-defined preferences"). Consequently, the Court, which held recently that the Constitution *permits* a State to impose an opt-in requirement, see *Davenport*, 551 U. S., at 185, has never said that it *mandates* such a requirement. There is no good reason for the Court suddenly to enter the debate, much less now to decide that the Constitution resolves it.

Of course, principles of *stare decisis* are not absolute. But the Court cannot be right when it departs from those principles without benefit of argument in a matter of such importance.

For these reasons, with respect, I dissent.